UNITED STATES of America, Plaintiff,

v.

**Gary BOWDACH, Defendant.**

**No. FL 75–124–Civ–NCR.**

United States District Court,
S. D. Florida.

May 22, 1976.

---

Gary L. Betz, U. S. Dept. of Justice, Strike Force, Miami, Fla., for plaintiff.

Daniel S. Pearson, Miami, Fla., for defendant.

ROETTGER, District Judge.

Defendant filed a motion to suppress the evidence seized from his home following his arrest. His arrest was made pursuant to a warrant but no search warrant had been issued for the house. Defendant, presently incarcerated, is being prosecuted under a three count indictment, each count charging him with a violation of 18 U.S.C.App. § 1202(a)(1) alleging receipt and possession of a different firearm by a felon. The motion to suppress is addressed only to the weapons described in Counts I and II.

The evidence revealed a day and evening of police work filled with bizarre twists and chilling drama that far exceed the television thriller.

On December 16, 1974 defendant Bowdach, a previously convicted felon,[1] was at liberty pending appeal of a Federal conviction and fifteen-year sentence for extortionate credit transactions. On that date the Government filed a motion in front of Judge C. Clyde Atkins of this court to revoke defendant's appeal bond and to issue a warrant for his arrest. This motion was supported by the affidavit of Special Agent Joseph Gersky of the F.B.I., which recited in great detail why defendant was a danger to the community and likely to flee the jurisdiction of the United States. The affidavit recited, among other things, that two reliable confidential sources stated Bowdach was a narcotics smuggler and dealer and, in addition, was a professional killer in the employ of Rick Cravero (indicted the next day in this court and subsequently convicted of conspiracy to distribute narcotics.) His salary allegedly was $200 and one-half ounce of cocaine per day. The sources indicated further that defendant kept at least a rifle with a telescopic sight, several pistols and a silencer with him at all times either in his apartment or in the trunk of his automobile. In addition, Bowdach kept a small black box reputedly full of cyanide ("Foo-foo powder") under the front seat of his car. Finally, defendant had stated he would flee the country if his extortion conviction was affirmed.

Judge Atkins announced to special agent Gersky that he was going to issue a warrant for Bowdach's arrest and revoke the bond. This was, in fact, done the same day.

Although Gersky didn't have the warrant of arrest in his hand at the moment, he told Sgt. Havens of the Dade County Public Safety Department that the warrant had been issued but he was unable to locate Bowdach. He warned Havens that he believed defendant to be extremely dangerous and there was a likelihood he would be armed. Agent Jellison advised Sgt. Havens that on previous arrests defendant had been in possession of a machine gun, a sawed-off shotgun, silencers, etc.

Sgt. Havens was in charge of an investigation of the "Cravero gang" which had been underway since May, 1973. Defendant and several of his known associates were subjects of this investigation. It developed early in the investigation that the matters being uncovered far exceeded the jurisdiction of the Dade County authorities and subsequently they worked closely with various federal agencies, including the F.B.I., Drug Enforcement Administration, Bureau of Customs, and the Bureau of Alcohol, Tobacco and Firearms. The information obtained was furnished freely among the agencies.

On December 17th, 1974, the Federal Grand Jury sitting in Fort Lauderdale returned an indictment against Cravero and seventeen other persons for conspiracy to distribute 52 kilos of cocaine and several thousand pounds of marijuana. The defendant was not one of the eighteen persons indicted. The indictment was returned before the undersigned and was ordered to be "sealed" pending arrest of the individuals named in the indictment. Subsequent trials arising out of this indictment were held before Judge Fay of this court.

---

1. Defendant was convicted of a felony by a court of the State of New York in 1961 and by the United States District Court for the Southern District of Florida in 1970.

It was the plan of the law enforcement officers to arrest all defendants named in the indictment in one evening on December 18th lest some of them learn of it and flee the country.

On December 18, 1974 Detectives Jane Kelly and Dave Saleeba had defendant's house under surveillance. When defendant left in mid-afternoon he saw them, stopped and got out of the car to look at them sitting about 100 feet away in the cemetery but then drove off. The officers next located defendant's car at Cravero's residence in Hollywood around 8 o'clock, or so. Bowdach left in his car with two other persons, described as males with shoulder-length hair both thin and having brown hair, one with a lighter shade of brown. Sgt. Havens suspected the persons accompanying defendant were Paul Jacobson and Kenneth Townsend, both named as defendants in the sealed indictment. Defendant had frequently been in the company of Jacobson who was both under another indictment[2] and investigation[3] at that time. Defendant left Cravero's residence, drove at a high rate of speed on side streets, and eluded the detectives. They searched at various likely places where they hoped to make contact again with defendant, but failing to do so they returned to defendant's residence.

Meanwhile, at defendant's residence four other officers[4] had set up surveillance at approximately 8:00 P.M. Two officers were in front of the apartment and two in the rear most of the time. The apartment was one of three units in a two-storied apartment building and was on the end of the building. The two officers usually in the rear of the apartment were unable to position themselves so as to command a clear view of the rear door. However, they felt they would see anyone leave by the rear door by a beam of light coming from the well-illuminated house in the event anyone opened that door.[5] Between 8:30 P.M. and 9:30 P.M. Detectives Kelly and Saleeba returned from Hollywood and were added to the surveillance forces. At 9:30 P.M. Sgt. Blue had radioed Havens that defendant and two males of a thin build, 5'7" to 5'9" and shoulder-length hair were observed outside defendant's residence where they opened the trunk of his Cadillac. They stayed outside only a short time, although one of the three men actually got into the trunk. They returned to the house and then came back out approximately five minutes later and again went to the Cadillac.

When Sgt. Havens arrived about 10 o'clock he began to plan the strategy to arrest Bowdach and also the other two individuals whom he believed to be Jacobson and Townsend, all without having the matter result in danger to anyone. In the time since 9:40, approximately the last time the trio returned to the apartment, none of the six-plus police officers had seen anyone leave the apartment, either by the front or rear doors.

What Havens didn't know was that defendant in the evening or on the way from Cravero's home had made several purchases: a 12-gauge pump shotgun and a Colt .357 Magnum revolver[6] and a police bandradio scanner. Defendant wasn't using the scanner but did so after receiving a phone call from one Bobby Miller, who had advised Bowdach that OCB (Organized Crime Bureau) not only had his house surrounded but they had been following him

---

2. Jacobson was acquitted of the charge of possession with intent to distribute 1400 pounds of marijuana before this court on January 8, 1975.

3. Havens knew Jacobson was the subject of an investigation of a bombing of a Miami bar owner's car which explosion blew off the driver's legs and caused the loss of one eye and other injuries.

4. Sgt. Walter Blue, Det. Bedwell, Det. Edward Schumacher and Det. Lonnie Adcock.

5. The assumption was incorrect: Bowdach brought a civil rights suit against Havens and other police officers. Judge Mehrtens of this court ruled in favor of defendants; in his unpublished findings a neighbor came to the Bowdach apartment and left without the police observing either event.

6. These are the objects of the motion to suppress.

all day and were talking about it on the radio, plus "they are going to kill you." Armed with this bit of counter-intelligence defendant made a bold move: he called the Dade County police and requested assistance alleging that there were a "bunch" of black males armed with shotguns who were trying to force their way into his house.[7] The call was received at 10:08 P.M. and a unit dispatched at 10:11 P.M. Police Officer Snyder arrived at 10:20 P.M., much to the surprise—and consternation—of Sgt. Havens and his surveillance crew which numbered over 10 officers at this time.

When the Dade County police cruiser pulled up to the Bowdach residence, Sgt. Havens dashed for his car and called headquarters to find out what was going on. He was advised that a call had been received from that address seeking help because there were a number of black males attempting to break in. At this point defendant and the uniformed police officer walked out of the house and Sgt. Havens ran to the front of the house as the door closed; he distinctly remembers hearing the door lock. He announced his identity and that a warrant had been issued for Bowdach and placed defendant under arrest. The uniformed officer, Snyder, who had accompanied Bowdach outside was unaware of the surveillance or the plans to arrest defendant; he was quite startled by the situation—so startled that he forgot to mention to Sgt. Havens that he had seen a shotgun leaning against a counter in a breakfast nook in the kitchen.[8]

At this moment Sgt. Havens heard a shout from the back of the house to the effect: "Look out—they have a shotgun."[9] He asked who was inside and defendant replied no one was. Havens turned to Mrs. Bowdach to inquire and defendant told her to shut up. Then came a shout from a female voice which Havens recognized as Detective Kelly's: "Look out, there are shadows in the house."

Sgt. Havens and Officer Snyder locked defendant inside Snyder's police cruiser and then Havens ran to the apartment building. He flattened himself against the wall under the only window on that side and edged around the building to the rear. He could see five or six police officers with guns drawn, either crouching or in covered positions; the police officers were pointing to the windows or the rear door.

Mrs. Bowdach came around to the rear of the house but refused to open the rear door or permit Havens to go in. Havens told her he had warrants for the arrest of persons who were inside and he had to go in to see if they were there and, if so, make the arrests and also to make sure the police wouldn't get shot as they left. Sgt. Havens also testified that at this point he was very concerned about the safety of the police officers and the safety of the neighbors who were beginning to emerge from nearby apartments.

Mrs. Bowdach remained adamant despite Havens' promise not to search the residence. Havens then yelled several times: "Police officers—come out!" Sgt. Havens then, with the help of Detective Stone, kicked in the door so that it was half-way off its hinges. Again he yelled: "Police officers—come out with your hands up." Again there was no response, so Havens and Stone kicked down the door. Havens repeated his warning. Again, no response. Havens inched inside and directly ahead of

---

7. The Government suggests that this was a cunning ruse to permit Bowdach an excuse to carry out the threat made when speaking to Miller that he would "blow away" the first police officer to come through his front door.

8. Snyder testified that when he went into the house Bowdach said he was in fear for his life because he felt detectives from the police department were attempting to kill him, and that there really weren't any black males outside but this was the only way he felt he could get

police assistance. He wanted to show Snyder where the police officers were waiting outside, walked out and was pointing at the location of the surveillance units when Sgt. Havens rushed up to make the arrest.

9. It was Officer Schumacher who yelled out the warning from the rear about the shotgun after he had seen the shotgun while peering in a rear window. Officer Schumacher has a distinct advantage in this regard: he is 6'7" tall.

him, leaning up against the counter in a breakfast nook was a 12-gauge pump shotgun. He ejected a shell from the chamber and gave the gun to the officer directly behind him. He looked around the downstairs, searched behind the sofa and in potential hiding places for persons he thought were there, viz., Jacobson and Townsend. Then Havens moved to the stairs. He yelled up the stairwell: "Police Officers—come down!" Silence. One could not doubt the sincerity of Sgt. Havens, watching him testify as to this search. He was reliving it and its moments of suspense, courage and apprehension. Havens crawled up the stairs to present a lower target and made his way into a large bedroom. On top of the dresser he could see shotgun shells, .357 cartridges, and empty holsters. He didn't tarry to touch the objects because he was only interested in locating the two suspects.

After quickly searching the large room he went to the other room. When he opened the door he was startled to see two children sitting up in bed. He told them to be still and stay in their beds; then he left. He added, with chagrin obvious both in his expression and voice, that he didn't know why he didn't look under the beds. He insisted that he completed his entire search of the apartment in one to two minutes. The court concludes that it must have taken nearly five minutes but in any event the sole purpose of his search was to find the other two males whom he believed to be in the apartment and believed to be defendants named in the sealed indictment.

After seizing the shotgun, agents of the Treasury Department traced its serial numbers to Gene's Sporting Center in Hollywood, Florida. There it was determined that in the late afternoon on December 18, 1974 the shotgun had been purchased in the name of Bowdach's wife, in defendant's presence. It was also revealed that a Colt .357 Magnum revolver had been purchased at that same time, also in the name of Bowdach's wife.

The Government has proposed three separate theories to support the legality of the search and seizure that occurred in defendant's apartment:

*Exigent Circumstances—Security Search*

■ The search in question admittedly was conducted without a warrant. As a general rule, any search is per se unreasonable if initiated without a warrant, unless the search falls within one of the narrowly defined exceptions to the warrant requirement. See e. g. *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031, 29 L.Ed.2d 564, 575 (1971); *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685, 693 (1969); *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967). Courts have long recognized an exception to the warrant requirement where the delay to obtain a warrant would seriously threaten or endanger the safety of police officers or other persons. *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); *Hopkins v. State,* 524 F.2d 473 (5th Cir. 1975); *United States v. Looney,* 481 F.2d 31 (5th Cir.), cert. denied, 414 U.S. 1070, 94 S.Ct. 581, 38 L.Ed.2d 476 (1973).

■ The search of defendant's apartment in the instant case clearly qualifies as a security search. Although defendant was placed under arrest outside the apartment building, the police officers on the scene reasonably feared that other individuals still remained inside the building and that these individuals posed a threat to their safety and the safety of the neighbors. The scope of the search of the apartment was no broader than what was minimally necessary to protect the officers from the perceived danger. Although the security search ultimately revealed that there were no other dangerous individuals on the premises, the determining factor as to the legality of a search is the reasonable perceptions of the officers prior to entry, not what is actually found therein.[10] The following

---

10. The court need not decide whether probable cause existed for the officers to believe that the individuals thought to be inside were actually

Jacobson and Townsend, for whom arrest warrants had been issued. It is sufficient that the police had reasonable grounds to believe that

statement from the Supreme Court's decision in *Warden v. Hayden, supra,* is particularly appropriate here:

> The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that [defendant] was the only man present and that the police had control of all weapons which could be used against them or to effect an escape. 387 U.S. at 298–99, 87 S.Ct. at 1646, 18 L.Ed.2d at 787.

■ Defendant contends that it was unnecessary to confiscate the shotgun found in the kitchen. He suggests that after the house had been secured the shotgun should have been returned to Mrs. Bowdach because the shotgun was not contraband or illegal per se. Defendant's argument must fail for two reasons. First, in this particular case the shotgun does fall within the definition of contraband. See *Warden v. Hayden, supra,* at 306 n. 11, 87 S.Ct., at 1649, 18 L.Ed.2d, at 791. An article may be considered contraband by its very nature, for example counterfeit money, a sawed-off shotgun or narcotic drugs. See, *Holt v. United States,* 404 F.2d 914, 917 (10th Cir. 1968), cert. denied, 393 U.S. 1086, 89 S.Ct. 872, 21 L.Ed.2d 779 (1969); *General Finance Corp. of Florida South v. United States,* 333 F.2d 681, 682 (5th Cir. 1964). In addition, other articles may acquire the status of contraband depending upon the circumstances under which they are received, possessed or transferred. See *State v. Bryant,* 250 So.2d 344 (Fla.App.1971). For instance, possession of an automatic weapon is legal only if the registration requirements of Chapter 53 of Title 26 are satisfied. So too the status of the shotgun in question depends upon the circumstances under which it is possessed. Possession by a convicted felon constitutes a criminal offense and in the hands of a felon the shot-

gun becomes contraband; possession of the shotgun by a non-felon has no legal consequences.[11] Thus, seizure of the weapon from defendant's apartment, where the officers could reasonably have concluded it was in defendant's possession, was entirely proper.

■ Defendant's argument must also fail for a second, more practical reason. It would have been foolhardy for the police to leave the shotgun on the premises in easy reach of Mrs. Bowdach. Prior to the entry into the house defendant's wife had displayed great hostility and hysteria. This emotional state was intensified when she witnessed the door to her apartment being kicked in and saw armed police officers search the residence. Curiously, she did not inform the officers that her children were in an upstairs bedroom. It was quite reasonable for the police to conclude that it was not in their best interests to return the weapon at that time. A receipt for the property was given to Mrs. Bowdach, but no attempt was ever made to have the shotgun released from police custody.

### Plain View

■ Evidence inadvertently discovered by a police officer rightfully in a position to observe it has long been held to be admissible. *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); *United States v. Rollerson,* 491 F.2d 1209 (5th Cir. 1974) (suspect legally detained for investigation; illegal weapon spotted); *United States v. Salas,* 488 F.2d 939 (5th Cir. 1974) (suspect legally arrested; paper parcel containing narcotics in plain view). The critical question always is whether the evidence was in fact exposed to the officer's view or whether it was discovered only as a result of a search.

■ In the instant case there are no less than three separate "plain views" of the shotgun. When Officer Snyder entered the apartment at defendant's request he no-

---

one or more of defendant's confederates was still present on the premises and that they posed a threat to their safety. *United States v. Sellers,* 520 F.2d 1281 (4th Cir. 1975).

11. U.S.Const. amend. II.

ticed the shotgun leaning against the breakfast nook. Snyder's presence there was unquestionably lawful, consequently his observation of the weapon comes within the plain view doctrine.

Likewise, Officer Schumacher's peering through the kitchen window of defendant's residence was proper under the circumstances. Ordinarily, if a police officer looked through the windows of a private residence it would be considered an invasion of the suspect's zone of privacy. See, e. g., *United States v. Bradshaw,* 490 F.2d 1097 (4th Cir. 1974), cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1975). However, Schumacher and the other officers on the scene were reasonably concerned about the presence of defendant's associates in the house. As previously noted, the police had a right to make a cursory search of the premises for the other individuals. Thus, Schumacher's observation falls within the ambit of the plain view doctrine. A fortiori, when Sgt. Havens and Detective Stone entered the kitchen their observation and subsequent seizure of the shotgun were also valid.

*Inevitable Discovery by Independent Sources*

The Government asserts that even if it assumed *arguendo* that the search and seizure were illegal, the shotgun is not the fruit of a poisoned tree, within the meaning of *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Since independent evidence of the presence of the weapon in defendant's apartment existed prior to the entry of the apartment by Sgt. Havens, the Government argues that it is not subject to the *Wong Sun* doctrine because such evidence inevitably would have been gained even without the unlawful action.[12] Although the facts of the instant case may be appropriate for the application of the "inevitable discovery" limitation on the exclusionary rule, it is unnecessary for

the court to reach this question because of the prior rulings that the search and seizure were valid under the plain view doctrine and as a security search.

It is worthy of note that the "inevitable discovery" limitation is in a rather confused state within this circuit. No Supreme Court decision has expressly promulgated this rule; certain circuits, however, have adopted it. See, *United States ex rel. Owens v. Twomey,* 508 F.2d 858 (7th Cir. 1975); *United States v. Falley,* 489 F.2d 33 (2d Cir. 1973); *United States v. Seohnlein,* 423 F.2d 1051 (4th Cir.), *cert. denied,* 399 U.S. 913, 90 S.Ct. 2215, 26 L.Ed.2d 570 (1970); *Wayne v. United States,* 115 U.S.App.D.C. 234, 318 F.2d 205 (Burger, J.), *cert. denied,* 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963).

The only Fifth Circuit case dealing with this question is *United States v. Castellana,* 488 F.2d 65 (5th Cir. 1974). The opinion by Judge Thornberry expressly rejected the "inevitable discovery" limitation on the exclusionary rule. It reasoned that, "To admit unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway would be to cripple the exclusionary rule as a deterrent to improper police conduct." *Id.* at 68. The *Castellana* decision was reviewed by the Court of Appeals en banc and the decision of the panel was reversed, but the reversal was based upon the ground that the search was valid under *Terry v. Ohio,* 392 U.S. 1, 87 S.Ct. 2050, 18 L.Ed.2d 989 (1968). *United States v. Castellana,* 500 F.2d 325 (5th Cir. 1974). The majority opinion did not touch upon the "inevitable discovery rule."[13] As a result, it is unclear whether the initial panel's views on the "inevitable discovery" rule have any precedential effect in this circuit.

*Conclusion*

The court finds that the police officers acted reasonably under the circumstances,

---

12. When Bowdach called the police to complain about the black males attempting to enter his apartment he informed the police dispatcher that there was a shotgun in the house. In addition, Officer Snyder's observation of the

shotgun was in no way tainted by the subsequent activities of the surveillance units.

13. Four judges joined in Judge Thornberry's dissenting opinion.

and that the search of defendant's apartment does not suffer from any legal infirmities. Thus, there is no basis for the exclusion of the shotgun from evidence or any other evidence obtained from leads developed as a result of the seizure. Therefore, defendant's motion to suppress is denied.

## MOTION FOR JUDGMENT OF ACQUITTAL

The indictment in the instant case charged the defendant in each count with possession and receipt of a firearm, in violation of 18 U.S.C. App. § 1202(a). No evidence was adduced at the trial to establish that at the time of the alleged offenses the guns were moving interstate or on an interstate facility, or that their possession affected commerce. Based upon the judicial dictum contained in *United States v. Bass,* 404 U.S. 336, 350, 92 S.Ct. 515, 524, 30 L.Ed.2d 488, 498 (1971),[14] prior to submitting the case to the jury the court granted defendant's motion for judgment of acquittal as to the possession charge in each count. The only question presented to the jury was whether on or about the times alleged in the indictment the defendant received a weapon which previously moved in interstate commerce.

The court denied defendant's motion for a judgment of acquittal on Count I[15] but the court reserved ruling as to Counts II and III. Subsequently the jury found defendant guilty on all three counts.

■ Count II related to a .357 Magnum revolver which was purchased on the same day as defendant's arrest, and at the same time as the shotgun described in Count I. The .357 Magnum revolver was never recovered by the authorities, but there was sufficient evidence to establish that this weapon was purchased in Mrs. Bowdach's name and in defendant's presence. The jury could reasonably conclude that Mrs. Bowdach was acting under defendant's direction and control and that defendant received the weapon. The Government also introduced evidence that this weapon had previously moved in interstate commerce. Consequently, defendant's motion for judgment of acquittal on Count II must be denied.

■ The circumstances surrounding the weapon in Count III (a .38 snub-nose Colt revolver) differ sharply from the weapons purchased on the night of the arrest. The revolver was seen only in the early morning hours of November 17, 1974, slightly over a month prior to the arrest. At about four o'clock that morning Mrs. Bowdach was driving her car at a high rate of speed on a street in Hollywood, Florida. As she passed a parked Hollywood police cruiser she yelled for help. In close pursuit was a yellow rental car. Before the patrolman could make a U-turn to follow her, Mrs. Bowdach made a sliding U-turn and came back to him. She exclaimed to the police officer that, "My husband and his friends are going to kill me." She then opened the glove compartment and handed the pistol to the police officer, saying "Please take it before he kills me."

At this moment defendant was hurrying up to the car on foot from a block or so away. He claimed that this was merely a

---

14. The *Bass* dictum means that a *contemporaneous* interstate nexus is necessary for a possession conviction under § 1202(a), but a *prior* interstate transportation of the weapon is sufficient where the offense charged is receipt of a firearm by a previously convicted felon. Certain circuits have specifically adopted this distinction made in *Bass. United States v. Bell,* 524 F.2d 202, (2d Cir. 1975); *United States v. Cassity,* 509 F.2d 682 (9th Cir. 1974). See *United States v. Pleasant,* 489 F.2d 1028 (8th Cir.), cert. denied, 416 U.S. 989, 94 S.Ct. 2398, 40 L.Ed.2d 768 (1974); *United States v. Kelly,* 519 F.2d 251 (8th Cir. 1975).

It is somewhat ironic that defendant had two previous convictions under 18 U.S.C. App. § 1202(a) reversed because of the *Bass* case. In these prior cases the indictments did not allege, and the Government made no attempt to show, that the firearms involved had a nexus with interstate commerce. *United States v. Bowdach,* 458 F.2d 951 (5th Cir. 1972) (conviction for possession of silencer affirmed); *United States v. Bowdach,* 454 F.2d 728 (5th Cir. 1972).

15. Count I related to the shotgun which was seized from defendant's residence, as described previously in connection with the motion to suppress.

family quarrel. Mrs. Bowdach interjected that the defendant was a liar and that "you know it's your gun." [16] .

The Government introduced evidence tracing the movement of this weapon in interstate commerce. It was shipped from Chapin, South Carolina to a gun dealer in Fort Myers, Florida on June 4, 1974. The .38 revolver was subsequently sold in Fort Myers to Kenneth Townsend on October 28, 1974.

Upon review of all the evidence as it relates to Count III in the light most favorable to the Government, the court concludes that there is not sufficient evidence to support the jury's verdict of guilt. The only evidence to support this finding is the excited utterance, described above, in which Mrs. Bowdach asserted that the gun belonged to her husband.

The defendant introduced into evidence excerpts from the transcript of defendant's bond revocation hearing before Judge Atkins in December, 1974. Kenneth Townsend testified at that hearing that on the night in question he had the use of Mrs. Bowdach's car, that he had used the .38 Colt earlier in the evening for target practice, and that he left the gun in the glove compartment of the car and left the car outside a local restaurant.[17] No evidence was adduced to indicate that defendant knew that the .38 was in the car or that defendant had even been in the car that evening. Mrs. Bowdach's excited utterance goes to the gun's ownership, but does not establish defendant's receipt of the weapon on the night of November 17, 1974.

Even if it is assumed that the excited utterance establishes defendant's receipt of the gun from Townsend, the purchaser, at some time prior to the evening of November 17, 1974,[18] the Government's case must then fall for failure to establish venue within the Southern District of Florida. Although Fort Myers is in southern Florida, it does not lie within the Southern District of Florida; instead it is located in the Middle District of Florida. The Government has the burden of proving that the criminal activity took place in the district where the prosecution is undertaken, but this proof need only be by preponderance of the evidence. *United States v. Haley,* 500 F.2d 302 (8th Cir. 1974). The locus of the offense in Count III may have been in either judicial district, or somewhere else for that matter.

The recent Fifth Circuit decision in *United States v. Burnette,* 524 F.2d 29 (5th Cir. 1975), presented a somewhat similar fact situation. In *Burnette* there was evidence that the defendant possessed the weapons on the night of the arrest but had not possessed them before arriving at the place of arrest, a mobile home near Lafayette, Louisiana. The court concluded that it was a reasonable inference that defendant had therefore received the weapon there, thus satisfying both the venue hurdle and the receipt requirement. The dissenting judge felt that the evidence fell short of satisfying the venue hurdle. In the instant case no such inference can be drawn because there was no evidence to place the weapon

---

16. This testimony was elicited from the patrolman, Officer Rogers; Mrs. Bowdach did not appear at the trial. The court admitted this hearsay statement as an excited utterance under Rule 803(2), Federal Rules of Evidence.

17. Since Townsend was unavailable at trial these statements were admitted under Rule 804(b)(1), Federal Rules of Evidence. At the bond revocation hearing the Government had the opportunity and motive to cross examine Townsend in an effort to discredit his testimony.

18. It is well established that the Government need not prove with precision or certainty the

date on which the offense was committed. It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged, provided the date was not a material element of the offense and defendant was not misled in preparing his defense. See *United States v. Lane,* 514 F.2d 22 (9th Cir. 1975); *United States v. Kerr,* 439 F.2d 689 (9th Cir. 1971); *United States v. Henderson,* 434 F.2d 84 (6th Cir. 1970). In the instant case the twenty day span between October 22, 1974 and November 17, 1974 alone is not fatal to the conviction.

in defendant's possession on the evening of November 17, 1974.

■■■ Venue, like other constitutional rights, is subject to waiver. Waiver of venue may be done expressly, as in a motion to transfer venue under Rule 20, F.R.Crim. Pro., or it may be done by inaction of the defendant. *United States v. Rivera,* 388 F.2d 545 (2d Cir.), cert. denied, 392 U.S. 937, 88 S.Ct. 2308, 20 L.Ed.2d 1396 (1968); *Gilbert v. United States,* 359 F.2d 285 (9th Cir.), cert. denied, 385 U.S. 882, 87 S.Ct. 169, 17 L.Ed.2d 109 (1966); *United States v. Mischlich,* 310 F.Supp. 669 (D.N.J.1970), aff'd 445 F.2d 1194 (3d Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 449, 30 L.Ed.2d. 368 (1971)[19]. In the instant case there was a proper allegation of venue in the indictment, but the proof at trial failed to support this allegation. At the close of the evidence defendant moved for judgment of acquittal but did not expressly include in his motion the failure to prove venue in Count III. At the time of making the motion for judgment of acquittal, the *Burnette* decision, supra, was discussed at great length in colloquy between counsel and the court. Since the *Burnette* decision dealt only with the sufficiency of the evidence and the question of venue, the court must conclude that the argument on venue was inherently raised by defendant in support of his motion. Consequently, the court concludes it would be unfair to presume a waiver on the issue of venue.

Consequently, defendant's motion for judgment of acquittal as to Count III is granted.

---

19. The court feels constrained to point out that the principles set forth in *Rivera* that an objection to improper venue is preserved by a general motion for acquittal but not if the motion particularizes the grounds for its objection and omits venue rewards the slothful advocate. In addition it permits an attorney to "whipsaw" a District Judge by merely making a motion for judgment of acquittal on general grounds without pointing out the specific basis for his motion and later leisurely urging grounds before the Court of Appeals which the trial court never had an opportunity to consider squarely. At least this general principle should be limited, as done by the Ninth Circuit in *Gilbert,* permitting appellate review of the issue only when the defendant had not been permitted or required to particularize his objections. 359 F.2d at 288.