**UNITED STATES of America, Plaintiff,**

v.

**Raymond Luc LEVASSEUR, Jaan Karl Laaman, Thomas William Manning, Richard Charles Williams, Carol Ann Manning, Patricia Gros and Barbara Curzi, Defendants.**

**No. 85 Crim 143.**

United States District Court, E.D. New York.

Oct. 29, 1985.

Asst. U.S. Atty. John Gallagher, E.D. N.Y., Brooklyn N.Y., for plaintiff.

William M. Kunstler, New York City, for Thomas William Manning.

Susan Tipograph, Flood, Tipograph & Holmes, New York City, for Patricia Helen Gros.

Margaret Ratner, New York City, for Barbara Curzi.

Elizabeth Fink, Brooklyn, N.Y., for Carol Ann Manning.

Lynne Stewart, New York City, for Richard Charles Williams.

Jesse Berman, New York City, for Jaan Karl Laaman.

Robert Boyle, Legal Asst. to Raymond Luc Levasseur, Brooklyn, N.Y.

Raymond Luc Levasseur, New York City, pro se.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GLASSER, District Judge:

Thomas Manning and Carol Manning, two of the seven defendants named in this case, have moved this Court for an order suppressing certain physical evidence seized from a house they occupied at 1885 Dodgeville Road, Jefferson, Ohio. A hearing was held on October 2, 1985. The findings of fact and conclusions of law that follow must be read against the background of the indictment and the orders thus far issued determining a variety of other pretrial motions.

The defendants have been charged in a twelve count indictment alleging a conspiracy to bomb buildings possessed and used by the United States and buildings used in interstate commerce; the actual bombing of six buildings used in interstate commerce including buildings used or possessed by IBM, South African Airways, Motorola Corp., General Electric Corp. and Union Carbide Corp; the actual bombing of two Army Reserve Centers, a Navy Reserve Center and a Navy Recruiting District Office; and an attempted bombing of a building housing the offices of the Honeywell Corporation. Those events are alleged to have occurred between 1982 and 1984.

The defendants were for these and other reasons, the objects of an intensive nationwide search for approximately ten years. Some were being sought for the murder of a New Jersey State Trooper; some for bank robbery; one for the attempted murder of a Massachussetts State Trooper; some or all for a series of bombings in Massachusetts between 1976 and 1979 and for a variety of other crimes. Searches of former residences of the Mannings and of Levasseur in Pennsylvania in 1982 yielded ammunition, ammunition boxes and other inculpatory material.

On the morning of November 4, 1984, the defendants Levasseur, Gros, Curzi, Laaman and Williams were arrested in and around Cleveland, Ohio. Thomas and Carol Manning were still at large. What transpired thereafter relevant to this motion was the subject of the testimony of Daniel A. Gordon, a special agent of the FBI for 19 years.

Agent Gordon testified that at approximately 11:00 P.M. on November 4, 1984 he became aware that the Mannings were residing in the area of Routes 6 and 11 in Ashtabula, Ohio. He subsequently ascertained the precise location of the residence from a telephone number that was previously furnished by defendant Williams and from a description of the house furnished by Carmen Levasseur who also disclosed that Carol Manning was using the name Leah Carr (Tr. 570–571). He was aware that the Mannings and Levasseur were wanted for bombings and were involved with explosives and dynamite (Tr. 573, 577). Agent Gordon, together with numerous other law enforcement officers, arrived at the Manning house at approximately 3:55 A.M. on November 5, 1984. Through a loudspeaker, the occupants of the house were directed to come out. Federal arrest warrants were outstanding for both Thomas and Carol Manning and when there was no response to the direction to come out, the agents entered the house. Entry was initially through the basement or a side window because of concern that the front and back doors might be booby-trapped.

The house was thoroughly searched for hidden occupants and none were found. In an upstairs bedroom, Agent Gordon saw four shoulder weapons on a wall. He also saw a Bearcat scanner—a radio device that was tuned to the frequency used by the FBI. Gordon also noted three footlockers in that bedroom, one of which was padlocked. It was suggested by another agent that the footlockers could contain explosives or be booby-trapped and that a bomb technician should examine them for the safety of the law enforcement officers in the house (Tr. 577). A bomb technician, Agent Atherton, was summoned. He

opened the footlocker without incident and Agent Gordon observed that it contained several guns and numerous boxes of ammunition (Tr. 588). Those items were left in the footlocker and not seized at that time. Gordon then phoned the Cleveland office of the FBI and related that information in connection with a request for a search warrant (Tr. 579). He knew before arriving at the Manning house that proceedings to obtain a search warrant were under way in Cleveland with respect to this house (Tr. 583). The house was then cleared and Special Agent Lloyd Buck was directed to maintain control of the house and to exclude all persons until the search warrant arrived.

Agent Gordon testified that after the house was searched for hidden persons and before the footlockers were opened he could have withdrawn all law enforcement persons to a safe distance from the house and kept it under surveillance until a search warrant was obtained but he chose not to do so (Tr. 597–98). That decision was prompted, he testified, for the safety of the officers on the scene because the footlockers could have exploded while they were still in the house (Tr. 610).

Agent James Lyon of the FBI was also called as a witness. He testified that he had been assigned to the investigation of this case since December 1982. He testified that the Mannings had rented the Dodgeville Road house under the names of Steven and Leah Carr. Rent was payable monthly in advance on the 22nd calendar day of each month and was paid through the month of November (Tr. 639). The Mannings never returned to the house after they left it. It is reasonable to infer that they left that house on November 4, 1984 for the following reason. When the defendant Williams was arrested on the morning of November 4th, he was transported to the Cleveland office of the FBI and interviewed by Agent Sommers. Williams was asked if he knew where the Mannings were located and he replied that he did not know but even if he did, that information would be useless because they would be long gone (Tr. 616). Williams

also stated that immediately prior to his arrest in the Curzi/Laaman house, a telephone call was received from Carol Manning. While he was speaking to her, he put her "on hold" to answer another incoming call. That call was from the Cleveland FBI advising him to surrender. The Mannings knew, therefore, on the morning of November 4th of the presence of the FBI and of the arrest of their co-defendants (Tr. 616–18).

The Mannings were arrested approximately six months later, on April 25, 1985, in Norfolk, Virginia. On the 16th of November, 1984, they rented a house at 134 Conway Avenue in that city. The lease was in the name of Allison S. Boone, as tenant, from month to month, at a rent of $425 per month (Govt's Exh. H–11). Thomas Manning was using the name of Charles Boone (Tr. 619). Received in evidence were a variety of exhibits seized from the Norfolk house pursuant to a search warrant. Photographs of the premises in which the Mannings lived (Exhs. H–10–A—H–10–E) depict a house that is moderately but comfortably furnished. Rent receipts from November 19, 1984 through April 24, 1985 were seized as were money orders to utility companies and department store receipts. Also seized were newspaper articles describing the arrests in Ohio on November 4, 1984 and the defendants who were then arrested. The Government attaches special significance to an article from the Winchester Star on which is a handwritten notation "11/5 Mon." Testimony was received that the Winchester Star is sold only in a particular area in the State of Virginia (Tr. 632) from which it may be inferred that on that day, the Mannings were in that part of Virginia and purchased that paper. Also received in evidence were the defendants' Exhibits A through E which include the lease of the Dodgeville Road house; a J.C. Penney order form dated 11/5/84 for a dog bed and a money order payable to the Star Beacon.

*Discussion*

The Government contends that the search and seizure prior to the issuance of

the search warrant was proper for any or all of the following reasons: (1) the Mannings had abandoned the Dodgeville Road house prior to the arrival of the police; (2) exigent circumstances justified the warrantless search and seizure; and (3) the contents of the footlocker would inevitably have been discovered.

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois,* 439 U.S. 128, 130–31, n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978). The proponents of this motion, Thomas and Carol Manning, offered no testimony which would establish an expectation of privacy in the premises in which they assert Fourth Amendment rights nor have they submitted affidavits in support of their motions in which they allege facts which would establish such an expectation. Indeed, since the only evidence raising an expectation of privacy in the Dodgeville Road house is a lease naming Steven and Leah Carr as tenants and there being no assertion by the movants (except by implication from the bringing of the motion) that Steven and Leah Carr and Thomas and Carol Manning are one and the same, the violation of any Fourth Amendment rights of these movants may be questioned. The Government has not challenged their standing to assert their Fourth Amendment claim at the suppression hearing during which it was implicitly assumed by the Government and the movants that the Carrs and the Mannings were one and the same and the motion will be determined on the basis of that assumption.

### A. Abandonment

■ In a motion to suppress physical evidence, the burden of proof is on the defendant who seeks the suppression. *United States v. Feldman,* 606 F.2d 673 (6th Cir.1979), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1648, 64 L.Ed.2d 236 (1980). Once the defendant has established some basis for the motion, as, for example, by a preliminary showing that the search was

conducted without a warrant, then the burden shifts to the Government to show that the warrantless search was reasonable. *United States v. Sacco,* 563 F.2d 552 (2d Cir.), *cert. denied,* 434 U.S. 1039, 98 S.Ct. 779, 54 L.Ed.2d 789 (1978). The standard of proof imposed upon the Government is a preponderance of the evidence, *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). *Matlock* also teaches that the Federal Rules of Evidence are generally not applicable and that hearsay is admissible.

■ The initial entry into the Dodgeville Road house was clearly lawful for at least two reasons. The Agents knew that there were outstanding federal arrest warrants for both Thomas and Carol Manning (Tr. 573–74) and the entry upon the premises to effect their arrest was, therefore, lawful. *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In the light of the background of the defendants and of the events leading up to this event as briefly outlined above, it could not be seriously disputed that there was also a compelling urgency to enter the house. *United States v. Bowdach,* 414 F.Supp. 1346, 1352 (S.D.Fla.1976), *aff'd* 561 F.2d 1160 (5th Cir.1977); *United States v. Sellers,* 520 F.2d 1281 (4th Cir.1975).

Having lawfully entered upon the premises, was the search of the locked footlocker proper? The Government urges that it was, contending first, that the Mannings had abandoned this house prior to the search of the footlocker. I note that although there were three footlockers in the room, there is no evidence that the other two, which were apparently not locked, were opened or that anything was seized from them prior to the issuance of the warrant.

■ The warrantless search or seizure of abandoned property is not unreasonable because an abandonment by the possessor of the property ends his reasonable expectation of privacy. "The proper test for abandonment is not whether all formal property rights have been relinquished, but whether the complaining party retains a

reasonable expectation of privacy in the articles alleged to be abandoned." *United States v. Wilson,* 472 F.2d 901, 902 (9th Cir.1973), *cert. denied,* 414 U.S. 868, 94 S.Ct. 176, 38 L.Ed.2d 116 (1973). Expectations of privacy, however, should be viewed objectively. The propriety of and necessity for an objective standard was succinctly stated in *United States v. Sledge,* 650 F.2d 1075 (9th Cir.1981) at 1077 as follows:

Expectations of privacy should be measured in objective terms. This follows not only from the proposition that protected expectations are those society as a whole treats as legitimate, itself an objective concept, but also from the premise that the primary if not sole justification for the exclusionary rule is the deterrence of police conduct that violates Fourth Amendment constitutional rights.... These concepts necessarily imply an objective standard for evaluating police conduct.

Abandonment is a question of fact, based upon intent and the answer to the question depends upon all the relevant circumstances existing at the time, including words, acts and other objective facts. *United States v. Cella,* 568 F.2d 1266, 1283 (9th Cir.1977); *United States v. Callabrass,* 607 F.2d 559, 566 (2d Cir.1979) (Oakes, J. dissenting); *United States v. Wyler,* 502 F.Supp. 959, 967 (S.D.N.Y. 1980). In this case, the relevant circumstances were, as has already been indicated, that the defendants were the objects of an intensive nationwide search for approximately ten years. They successfully eluded law enforcement authorities during that period by adopting aliases and living "underground." The Agents were aware of those facts. The Agents knew that five of the Mannings' codefendants were taken into custody during the preceding hours. The Mannings learned of at least three of those arrests as they took place on the morning of November 4, 1984 from the fortuitous call by Carol Manning to the Curzi/Laaman house at the same time the FBI called to direct the occupants of the house to surrender (Tr. 616–18). Codefendant Richard Williams had indicated follow-ing his arrest that the Mannings would be long gone (Tr. 616).

These circumstances, when viewed together with the absence of any occupants in the Dodgeville Road house on November 5th, could lead a reasonable person to only one conclusion—that the Mannings had permanently left that house without any intention of returning and fled to places unknown in order to avoid arrest. This evidence amply supports a finding of abandonment.

It is not clear from the record whether at the time the footlocker was opened Agent Gordon in fact knew of Williams' specific statement regarding the phone call from Carol Manning. That he was aware that Williams furnished some information is clear (Tr. 570–71). Whether or not the specific statement was known to Agent Gordon is, in any event, insignificant. *See Feguer v. United States,* 302 F.2d 214, 250 (8th Cir.) (Blackmun, J.), *cert. denied,* 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110 (1962); *Parman v. United States,* 399 F.2d 559, 565 (D.C.Cir.1968) (Burger, J.); *United States v. Callabrass,* 607 F.2d 559, 566 (2d Cir.1979) (Oakes, J. dissenting).

In *Callabrass,* Judge Oakes in a dissenting opinion, observed that "it is not material to a finding of abandonment that (the officer) did not know at the time that he entered the house whether appellant would return; it is sufficient that subsequent events show that appellant had already formulated the intent to abandon the house and the personal property inside." 607 F.2d at 566.

The subsequent events in this case are illuminating. The search of the Manning house in Norfolk, Virginia pursuant to a warrant months later revealed numerous newspaper accounts of the November 4th arrests. Among those clippings was one from the Winchester Star dated November 5, 1984. That newspaper is sold within a particular area of the State of Virginia (Tr. 632) and the inference that the Mannings were in that area of Virginia on November 5th is reasonable if not compelling. The

defendants' suggestion that the possession of that newspaper clipping might be explained by the purchase of a back issue at a later date is not persuasive. The Mannings, now adopting the name Boone and discarding Carr, signed a lease for a residence in Norfolk, Virginia on November 16, 1984. A security deposit of $400.00 was paid on that day (Exh. H–12).

■ The defendants urge that the payment of rent by the Mannings for the Dodgeville Road house through November 1984 belies any intent to abandon those premises. As to this, it is plain that a finding of abandonment is not foreclosed until the period for which rent has been paid runs out. *Feguer v. United States,* 302 F.2d 214, 250 (8th Cir.), *cert. denied,* 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110 (1962); *United States v. Wilson,* 472 F.2d 901, 903 (9th Cir.1972), *cert. denied,* 414 U.S. 868, 94 S.Ct. 176, 38 L.Ed.2d 116 (1973). Indeed, it is significant in this regard that the Mannings leased the premises in Norfolk, Virginia under another assumed name by a lease for which they paid rent for a period that extended beyond the time for which rent was paid on the Dodgeville Road house. *See Parman v. United States,* 399 F.2d 559, 564 (D.C.Cir.1968).

On November 24, 1984, the defendants paid $671.98 to purchase a washer and dryer for their Norfolk, Virginia residence from Sears Roebuck and Co. (Exh. H–13). From this it is reasonable to infer that the defendants contemplated more than a transient stay at that house and did not intend to return to the house on Dodgeville Road.

The defendants offered a number of photographs of the Dodgeville Road house that were received in evidence (Exh. F). Those photographs depict a house that is furnished and lived in and were offered to buttress the contention that the defendants had no intent to abandon this house and retained a continued expectation of privacy. The simple answer to this contention is that the Mannings may have had the intention of remaining in that house but only so long as their presence there was not known to the police. Having learned that their location was known or imminently to be known by the police, they abandoned it.[1]

The defendants rely heavily on *United States v. Wyler,* 502 F.Supp. 959 (S.D.N.Y. 1980). That case is clearly distinguishable. To begin with, the court there found that the initial warrantless entry upon the premises was unlawful, a factor to which the court repeatedly alluded. The warrantless entry here, as has already been indicated, was a lawful one. In *Wyler* there was clear evidence that the occupants planned to leave possessions in the house because they intended to continue their residence there. 502 F.Supp. at 962. The furniture movers were expressly advised that certain cartons and furniture were to remain. 502 F.Supp. at 963. A person was asked to watch the house while the occupants were away, 502 F.Supp. at 968. One of the occupants did return to the house after the search occurred which, said the court, "runs counter to a claim of abandonment." 502 F.Supp. at 968. False identities were assumed by the occupants *after* the search. 502 F.Supp. at 967. The most significant distinguishing feature between *Wyler* and this case, however, lies in the background against which the facts in each are to be objectively assessed. The defendants in *Wyler* were not fleeing from police who were searching for them for approximately 10 years and who were now dramatically

---

1. The defendants urged upon oral argument that because guns were left behind at the Dodgeville Road house, items which surely would have been taken had they abandoned the house (Tr. 1622), it is reasonable to infer that they intended to return. That argument is premised upon the assumption that the Mannings learned of the imminent arrest of their colleague from the telephone call to the Curzi/Laaman house having been made from the Dodgeville Road house. The more reasonable inference to be drawn from the fact that those guns were left behind is that the telephone call to the Curzi/Laaman house was made from a place outside the Dodgeville Road house to which they then never returned. That inference is also consistent with the absence of disarray in the house which the defendants contend is also significant.

close to ending that search. The defendants here were.

■ From all outward appearances, measured in objective terms, the Mannings abandoned the Dodgeville Road house. The fact that they may have retained a subjective expectation of privacy does not render the search invalid if that expectation is intrinsically unreasonable and not otherwise entitled to protection. The officers acted reasonably in relying on the appearance of abandonment. The ultimate requirement is reasonableness under the Fourth Amendment and I believe that the Fourth Amendment requirement of reasonableness is satisfied here. I find that the Government has established by more than a fair preponderance of the evidence, that the defendants clearly abandoned their expectations of property in the house on Dodgeville Road. *See United States v. Sledge,* 650 F.2d 1075, 1079–80 (9th Cir. 1981).

*B.  Inevitable Discovery*

■ The motion is denied for the additional reason that the contents of the footlocker fall within the "inevitable discovery" exception recently approved in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). In *Nix,* the Court decided that evidence or information initially acquired illegally need not be excluded "[i]f the prosecution established by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means...." 104 S.Ct. at 2509. That exception is aptly applied to the facts of this case.

At the time the footlocker was opened, FBI agents in Cleveland were already in the process of preparing an application for a warrant authorizing a search of the entire house (Tr. 583). Had Agent Gordon not decided to open the footlocker when he did, its contents surely would have been discovered later that day when the search warrant was issued. It is important to note that the defendants do not assert nor was there any evidence that the Agents opened anything other than that one footlocker and the contents of that footlocker were not seized until after the search warrant was issued.

The facts in this case satisfy the Eleventh Circuit formulation of the inevitable discovery exception heavily relied upon by the defendants:

> To qualify for admissibility, there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued *prior* to the occurrence of the illegal conduct.

*United States v. Satterfield,* 743 F.2d 827, 846 (11th Cir.1984) (emphasis in original). There is no question that "the lawful means which made discovery inevitable" were in police possession before the footlockers were opened. The affidavit for the search warrant, which I have previously ruled presented probable cause,[2] contained information culled from several years of investigation. Defendants contend, however, that the second prong of *Satterfield* requires the prosecution to show that "the agents ... [had] a valid affidavit, fully executed, that recites probable cause at the time of the illegal search." Defendants' Reply Brief at 10. This contention overstates the requirements of *Satterfield* and of exceptions to the "fruit of the poisonous

---

**2.** My prior decision on probable cause negates any concern about the fact that information learned from opening the footlocker was included in the affidavit for the search warrant. It is well settled that "[t]he ultimate inquiry on a motion to suppress evidence seized pursuant to a warrant is not whether the underlying affidavit contained allegations based on illegally obtained evidence, but whether, putting aside all tainted allegations, the independent and lawful information stated in the affidavit suffices to show probable cause." *United States v. Lace,* 669 F.2d 46, 49 (2d Cir.1982) (quoting *United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) (Powell, J., concurring and dissenting). As I found in my decision dated October 7, 1985, the affidavit in question provided ample probable cause for issuance of a search warrant even if the information concerning the footlocker were disregarded.

tree" doctrine in general. The court in *Satterfield* warned only that the "Government cannot later *initiate* a lawful avenue of obtaining the evidence and then claim that it should be admitted because its discovery was inevitable." 743 F.2d at 846 (emphasis added). In other words, what is required is a showing that, "even if the constable blundered once, he has taken enough proper steps that his lawful investigation is not thereby invalidated." *United States v. Alvarez-Porras*, 643 F.2d 54, 63 (2d Cir.1981). Taking into account the mass of information already gathered, and the fact that the affidavit for the search warrant was being drafted at the time the footlocker was opened, one can only conclude that the agents had "taken enough proper steps" such that application of the inevitable discovery exception is warranted.

The only case that suggests a different result is a decision of the Sixth Circuit that held that the inevitable discovery exception should not be applied to uphold an illegal warrantless search on the prediction that a warrant would have been obtained:

> The assertion by police (after an illegal entry and after finding evidence of crime) that the discovery was "inevitable" because they planned to get a search warrant and had sent an officer on such a mission, would as a practical matter be beyond judicial review. Any other view would tend in actual practice to emasculate the search warrant requirement of the Fourth Amendment.

*United States v. Griffin*, 502 F.2d 959 (6th Cir.), *cert. denied*, 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974). However, *Griffin* has been distinguished in this circuit with language that is equally applicable to the facts in this case. In *United States v. Alvarez-Porras*, 643 F.2d 54 (2d Cir.1981), the court was faced with a situation where police officers began to search an apartment in the mistaken belief that a warrant had been signed. In fact, the warrant was not issued until a short time later. Upholding the admission of evidence discovered prior to the issuance of the warrant, the court noted: "[T]here is no need to speculate as to whether the evidence seized ...

would ultimately have been found. A warrant was, in fact, issued. A search was, in fact, conducted." 643 F.2d at 65. The court also "stress[ed] the agents' good faith in trying to comply with the warrant requirement," noting that they had "discontinued th[e] search when their mistake was discovered." *Id.* Similarly, the decision of the agents in this case to rely on the "exigent circumstances" exception to search a single footlocker, even if that decision is assumed to be an erroneous one, was obviously not an attempt to evade the warrant requirement of the Fourth Amendment. A full-blown search of the entire house was not undertaken until the warrant was issued. Thus, allowing the evidence to be admitted in this case would not undermine "[o]ur constitutionally mandated preference for substituting the judgment of a detached and neutral magistrate for that of a searching officer...." *Satterfield*, 743 F.2d at 846.

Given my determination that the evidence is admissible because the defendants abandoned their reasonable expectations of privacy and because the inevitable discovery exception is clearly applicable, I need not reach the issue of exigent circumstances raised by the Government.

For the foregoing reasons, the motion to suppress is denied.