**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Harold Eugene MANNING, Defendant-Appellant.**

**No. 28805.**

United States Court of Appeals, Fifth Circuit.

March 30, 1971.

Tracy Danese, Jacksonville, Fla., for defendant-appellant.

John L. Briggs, U. S. Atty., M. D. Florida, Allan P. Clark, Asst. U. S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before TUTTLE, DYER and SIMPSON, Circuit Judges.

DYER, Circuit Judge:

Manning was found guilty of robbing a Keystone Heights, Florida, bank in violation of 18 U.S.C.A. § 2113(a).[1] Urging us to reverse, Manning's principal arguments are that the court below improperly admitted, over his objection, evidence establishing that he was in possession of a large amount of cash immediately after the bank robbery; that the court should have excluded an airplane ticket, taken from his car during a warrantless search; and that because of prejudicial newspaper publicity, the trial court abused its discretion in refusing to grant a mistrial. We affirm.

Taking the view of the evidence most favorable to the Government, Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680, we find that the following events transpired between March 30, 1969, and May 5, 1969.

1. Manning's wife Arlene, John Troglen, and Lester Ruis were also indicted for alleged participation in the same bank robbery. Ruis pleaded guilty. Troglen pleaded guilty to possession of a portion of the money taken in the robbery. At the close of the Government's case, Arlene's motion for judgment of acquittal was granted.

On March 30, 1969, Manning, his wife Arlene, and John Troglen arrived at the Ohio Motel in Green Cove Springs, Florida, twenty miles from Keystone Heights, in a maroon Dodge automobile with California license plates YLT 122. Apparently they stayed at the motel until April 2, 1969, when they spent the night with Manning's parents, who reside in Green Cove Springs, At approximately 7:30 a. m., April 3, Ruis came to Manning's parents' home; then Manning, Arlene, Troglen, and Ruis all left in the maroon Dodge.

About 6:30 a. m., April 3, 1969, a white 1964 Dodge Coronet with Florida plate 45–1031 was discovered missing from Hardy's automobile lot in Starke, Florida, approximately twelve miles from Keystone Heights. Later the same day, it was recovered two miles from Keystone Heights.

Between 7:40 a. m. and 9:00 a. m., when the bank opened, various people saw Manning sitting in a white car, identified either as a Falcon or Dodge, which was parked in a yard about eighty feet from the bank. Manning was wearing a light colored cowboy hat. Soon after the bank opened, Manning and another man got out of the car and walked into the bank. Six eyewitnesses inside the bank positively identified Manning as the taller of the two robbers. Wearing a cowboy hat and holding an attache case and a pistol, he stood at the front door.[2] The other robber (later determined to be Ruis), armed with a shotgun, went to the tellers' windows and ordered them to place money in a bag held by him. A total of $24,430.30 was taken.

Shortly after 9:00 a. m. Lyle Lydick and his grandson were traveling to a dump outside Keystone Heights to dispose of some trash. To reach the dump, they drove through a wooded area on an unpaved sand road, where they passed a maroon car with California license plates parked alongside the road. A woman was seated in the front on the passenger side. When the Lydicks returned from the dump along the same road, about 9:30 a. m., the maroon car was gone. However, a white car was parked in the woods approximately one hundred yards from the spot where the maroon car had been. About 11:30 a. m. the F.B.I. identified this car as the 1964 Dodge taken from Hardy's lot in Starke, Florida.

On April 4, 1969, Manning stored the maroon Dodge in Cassidy's Garage in Macon, Georgia. Later federal agents found the vehicle, obtained a warrant, and searched it. Inside, among other things, were papers and cards in the name of John Troglen, a lady's pocketbook containing latex gloves, correspondence addressed to Manning, a wallet containing an identification of Harold Eugene Manning, photographs of Manning, and male and female clothing. The Dodge bore a California registration in the name of Troglen. Arlene's fingerprints were on one door.

The following day, April 5, 1969, Manning and Arlene rented a house in San Bernardino, California, for one month from the owner, Mrs. Hammock. On April 7, 1969, Manning, Arlene, and another man appeared at a used car agency in San Bernardino; and she purchased a used Lincoln and a used Chevrolet, paying $1,358.90 in cash.

About this time Manning's mother received a package mailed by him. Disposing of the outer wrapping without observing from where the package was mailed, she found a Seagram whiskey carton. In an effort, so she said, to hide the whiskey from her husband, Mrs.

---

2. The positive identification of Manning was made by a vice-president, two tellers and three customers. Two other tellers were unable to make any identification. Another vice-president and teller, without positive identification, described one robber as wearing a cowboy hat and holding a pistol. The only defense witness, a customer, identified Troglen instead of Manning and described the robber as wearing a soft cloth hat with a narrow brim instead of a cowboy hat. At first the witness thought Troglen was his neighbor.

Manning put the carton in the deep freeze. Subsequently Manning called his mother on the telephone but would not tell her where he was. He inquired about her health and asked whether she had seen Ruis. Later when Manning's mother and father returned home from a few days' trip, Mrs. Manning, fearing that the whiskey might have frozen and exploded, took the carton out of the freezer and found money inside. Manning's father promptly called the F.B.I. On April 19, 1969, an F.B.I. agent called on the senior Mannings. He counted seven hundred seventy-five pieces of currency in the Seagram box—eight five dollar bills, five twenty dollar bills, two hundred thirty-one ten dollar bills, and four hundred eleven one dollar bills, totalling two thousand eight hundred and sixty-one dollars. No decoy money taken during the robbery was found among these bills.

In the meantime, on April 11, 1969, Manning and Arlene moved into the Edgewater Beach Motel Apartments in Santa Cruz, California. Registering as Mr. and Mrs. John Troglen, they were known as Arlene and Gene while they were there. On April 20, 1969, when the motel manager brought a cake to Arlene, she saw stacks of money on top of the TV in the Mannings' room.

Manning and Arlene left the motel in Santa Cruz on April 21, 1969. On April 25, 1969, using the name John Troglen, they rented a mobile unit in a Portland, Oregon, trailer park for thirty days. Manning told the owner that they were looking for a business to buy—that they had left money with his father. Five days later, on April 30, 1969, F.B.I. agents arrested Manning and Arlene in their trailer unit. In Manning's billfold the agents found a claim check for the 1966 Dodge stored in Cassidy's Garage in Macon, Georgia, a California registration for the car in the name of John David Troglen, and a social security card in Troglen's name. In a locked suitcase, they found thirty-two twenty dollar bills and twelve five dollar bills, a total of seven hundred dollars. No decoy bills were found.

On May 2, 1969, F.B.I. agent Koldemer accompanied Mr. and Mrs. Hammocks to the San Bernardino house rented to Manning and Arlene on April 5, 1969. Apparently the Mannings had stayed there only the first day. There was garbage and refuse on the back porch, the back door was unlocked, and a strong stench was emanating from the home. Some decayed food was found on the kitchen table, and the sink was filled with stagnant dishwater. There were no items of clothing. A white Pontiac convertible bearing a Florida license was in the car port. Inside the car, which was locked, there was an airline passenger coupon issued by Delta Air Lines to Mr. and Mrs. D. Troglen for an April 4 flight from Macon to Atlanta, Georgia, thence to Los Angeles, California. On May 5, 1969, the Mannings' rental period having expired, the agent returned. Without a search warrant but with the Hammocks' permission, he entered the car and removed the airline coupon.

### The $2871 Deep Freeze Cash Cache and the $700 Locked Suitcase Stash

Manning strongly contends that the prosecutor did not prove that he mailed the money received by his mother. Moreover, he argues, even if he sent the funds, the mere fact that after the robbery he possessed large sums of money not identified as the stolen currency was irrelevant. Manning attributes identical irrelevance to the money seized at the time of his arrest, since it was never shown to have been stolen from the bank.

The record leaves us with no doubt that Manning sent $2871 to his mother. There is no suggestion that Mrs. Manning's receipt of the package was adventitious. However, Mrs. Manning did not attempt to reveal the source of this manna. Instead, she proclaimed it a mystery. Obviously the jury did not agree; to them the identity of Mrs. Manning's benefactor was manifest. While Mrs. Manning did not testify as to the identi-

ty of the sender, she had told her husband that her son had mailed the package. Immediately her husband notified the F.B.I. Could there have been a conceivable reason for calling the F.B.I. other than the husband's knowledge of the nexus between mother and son with regard to the money and his knowledge of the bank robbery? We think not. "Even if a fact, standing alone, does not conclusively demonstrate guilt, a defendant is not entitled to have it filtered out of the evidence. An effort to blinker out all circumstantial color and tone would result only in distortion." Jones v. United States, 4 Cir. 1958, 262 F.2d 44, 47, cert. denied, 1959, 359 U.S. 972, 79 S.Ct. 887, 3 L.Ed.2d 839.

Consideration of other relevant facts brightens the hues and clarifies the picture of Manning's involvement in the Keystone Heights robbery. Six witnesses positively identified Manning as one of the two armed robbers in the bank. Furthermore, after the robbery when Manning and his wife were moving from place to place, under assumed names and with no visible means of livelihood, a motel manager observed a large stack of money in their room. When Manning was apprehended, $700 in cash was found in his trailer.

Manning concedes that possession of large sums of money by an accused after a robbery can circumstantially prove participation in the crime of robbery but, he argues, only if the money is identified as that which was stolen, or if the defendant was impecunious prior to the time of the robbery. He points out that no decoy money was found in the mailed or in the seized money and now asserts that his impecuniosity was not shown. In the circumstances of this case, the provisos Manning attaches to the conceded rubric are unnecessary appendages.

In Williams v. United States, 1897, 168 U.S. 382, 18 S.Ct. 92, 42 L.Ed. 509, upon which Manning relies, during the period when defendant, a Chinese inspector, allegedly extorted $185, he deposited in a bank sums aggregating nearly $5000. The Court opined that Williams was not "under any obligation * * * to explain that which did not appear to have any necessary or natural connection with the offense imputed to him." *Id.* at 397, 18 S.Ct. at 97. Nevertheless, where, as here, the evidence overwhelmingly shows a "necessary or natural connection" between the offense and the defendant the *Williams* rule does not apply. "The discussion in the Williams case * * * shows that no general rule of evidence was laid down. The case is to be taken, we think, as no more than a ruling on the particular facts there presented." United States v. Jackskion, 2 Cir. 1939, 102 F.2d 683, 684; cert. denied, 307 U.S. 635, 59 S.Ct. 1032, 83 L.Ed. 1517; *see* Self v. United States, 5 Cir. 1957, 249 F.2d 32, 34–35 and n. 2; O'Shea v. United States, 6 Cir. 1937, 93 F.2d 169, 172. Alexander v. United States, 5 Cir. 1965, 354 F.2d 59, lends no vigor to Manning's argument. There this Court found error in admitting thirty-nine bills stolen from a bank because a co-defendant, in a confession which was given to the jury but later ruled inadmissible, stated that he had received the money from the defendant. We found that under the circumstances—in light of the co-defendant's confession, his statements implicating Alexander, and the inferences which the jury could have drawn from the co-defendant's "taking the Fifth"—the prejudicial effect of such evidence could not be erased by judicial admonition. Certainly in the factual context *sub judice,* unlike that in *Alexander,* there is much "other persuasive evidence of guilt." *See id.,* at 63. Finally, Manning's reliance on Neal v. United States, 8 Cir. 1939, 102 F.2d 43, to buttress his contentions is misplaced. In *Self, supra,* this Court distinguished *Neal* as involving "the question whether the money possessed by the appellant came into his hands before or after an amendment of Aug. 24, 1937 to the statute involved. 12 U.S.C.A. § 588b." (which for the first time made stealing from a bank a federal offense). 249 F.2d at 34 n. 2.

Self v. United States, *supra*, evidentially parallels the instant case in important respects. Self and his accomplice Orr parked their car in front of the residence of a witness who lived across the street from the rear of a bank. They remained in the car for about twenty minutes and then entered the bank. Employees of the bank testified concerning the details of the robbery by two men, one using a gun and the other gathering the money into a shopping bag. When Orr was later arrested he had almost five hundred dollars in his home. Orr urged that affluence after the robbery could not be considered without first proving impecuniosity prior to the robbery. This Court explained the rule as follows:

> It is evident, also, that appellant misconceives the rule sometimes applied to reject evidence of possession of money after the commission of a crime without showing destitute circumstances of the party prior to the crime. The authorities cited do not tend to establish the rule as one of general or inflexible application. The most that can be said of it is that proof of the unexplained possession of unusual amounts of money after a robbery, *standing alone*, is not competent evidence to connect the possessor with the robbery; but it becomes competent provided it is further shown that he was impecunious prior thereto.
>
> The money possessed by Orr after the robbery was sufficiently connected with that taken from the bank *by other circumstances*, some of which are recited above, and was admissible under the facts of this case *without a showing of Orr's financial condition prior to the robbery*.

*Id.* at 34–35 (footnotes omitted) (emphasis added).

In a bank robbery case, the Tenth Circuit recently said that "possession of a large sum of cash at about the time of an offense may be considered as part of the circumstantial evidence where warranted by the particular facts involved.

* * * Nor do we think that the absence of proof of prior poverty destroyed the relevance of proof of the cash purchase here in view of the circumstances recited surrounding the transaction and other incriminating evidence." United States v. Brewer, 10 Cir. 1970, 427 F.2d 409, 411; see Yates v. United States, 10 Cir. 1966, 362 F.2d 578, 579; *cf.* Lewis v. United States, 9 Cir. 1967, 373 F.2d 576, 578, cert. denied, 389 U.S. 880, 88 S.Ct. 116, 19 L. Ed.2d 173. *See generally* Weinstein & Berger, "Basic Rules of Relevancy in the Proposed Federal Rules of Evidence," 4 Ga.L.Rev. 43 (1969).

■ We are equally unimpressed with Manning's insistence that the bills that were mailed and the bills that were seized were erroneously admitted without proof that they were the currency taken from the bank. "Where there is other evidence of the guilt of the accused and the crime is of such a nature that the acquisition of money may be regarded as a natural or ordinary result of its perpetration, evidence is admissible of the sudden acquisition of money by the defendant * * * at or subsequent to the time the offense was committed, although the source of the money is not definitely traced or identified by the prosecution." Anno., 91 A.L.R.2d 1046, 1049; United States v. Jackskion, *supra*.

### The Airplane Coupon Taken from Manning's Car Without a Warrant

Although the Mannings rented a house in San Bernardino on April 5, they remained there only one day. Their whereabouts are unknown until April 11, when they checked into a motel in Santa Cruz, California. On April 25 they rented a mobile unit in Portland, Oregon, for thirty days. There they were arrested by the F.B.I. on April 30 and held in custody. On May 2 the F. B.I. and the owner of the premises went through the house in San Bernardino and looked into the car. On May 5 the F.B.I., with the permission of the owner of the premises, took from the car a Del-

ta flight coupon pertaining to a flight made by the alleged Mr. and Mrs. Troglen from Macon, Georgia, to Los Angeles, California, on April 4, the day after the bank robbery.

Manning moved to suppress the flight coupon and the testimony of a Delta Air Lines passenger sales representative because the search was admittedly made without a warrant and was not incident to Manning's arrest. The trial judge refused.

■ It is undisputed that the Mannings' rental period had expired on May 5 and that the owner of the premises gave the F.B.I. permission to search the car. Furthermore, it was clearly established that even though the Mannings had rented the San Bernardino house for thirty days, they departed after the first day leaving no personal belongings. The door was unlocked, food was on the table, and dishwater was in the sink. Thirty days later the same condition prevailed. Moreover, the decayed food created a stench, the grass was uncut, and the weeds had grown high.

These circumstances strongly indicate that the Mannings had abandoned the house and car: thus the Government lawfully seized the flight coupon in connection with the investigation of a crime. Abel v. United States, 1960, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668, is instructive. There the F.B.I., without a warrant, searched a hotel room after Abel had vacated it and found two incriminating items. The Court said that the search "was entirely lawful, although undertaken without a warrant. This is for the reason that at the time of the search petitioner had vacated the room. The hotel then had the exclusive right to its possession, and the hotel management freely gave its consent that the search be made." *Id.* at 241, 80 S. Ct. at 698.

Whether there has been an abandonment, of course, depends upon all relevant circumstances existing at the time. For example, in United States v. Gibson, 5 Cir. 1970, 421 F.2d 662, 663, we held

that an F.B.I. examination of a car six days after it had been left on a lot did not constitute an unreasonable search or seizure since "appellant was not in custody and possession of the automobiles which had been abandoned." If indeed there has been an abandonment, a search with the landlord's permission even before the rental period has expired is not unlawful. Feguer v. United States, 8 Cir. 1962, 302 F.2d 214, 249–250, cert. denied, 371 U.S. 872, 83 S.Ct. 123, 9 L. Ed.2d 110. The F.B.I. agents' entry of the car and seizure of the airlines coupon on May 5 was not an unreasonable search and seizure.

■ Even if there was an unlawful search of the Manning car and the trial judge therefore erroneously denied the motion to suppress the flight coupon and the testimony of the airline witness, we hold that such error—if error there was—was harmless to Manning beyond a reasonable doubt. Chapman v. California, 1967, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. The only fact established by the coupon was that a Mr. and Mrs. Troglen flew from Macon, Georgia, to Los Angeles, California, on April 4, 1969. Independent of this evidence, there was no dispute that the Mannings used the name Troglen. Manning's parents placed their son and his wife in Green Cove Springs, Florida, at 7:30 a. m. on April 3, 1969. Six eyewitnesses positively identified Manning in the Keystone Heights bank shortly after 9:00 a. m. It was established that Manning stored the maroon Dodge, observed in the wooded area near Keystone Heights both before and after the robbery, in a garage in Macon, Georgia, on April 4. It was shown without contradiction that on April 5 the Mannings rented a house in San Bernardino, California, about fifty-nine miles from Los Angeles. Obviously, if the Mannings were in Macon, Georgia, on April 4 and in San Bernardino on April 5, they had to travel by plane. In deciding whether the claimed error was harmless our judgment must be based on a consideration of the circumstances "and on what

seems to us to have been the probable impact of * * * [the coupon] on the minds of an average jury. * * *" Harrington v. California, 1969, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284. Apart from the coupon, the evidence was so overwhelming that any possible error in admitting the coupon was harmless error beyond a reasonable doubt. Brown v. Beto, 5 Cir. 1970, 425 F.2d 246, 247; Thompson v. United States, 9 Cir. 1967, 382 F.2d 390, 394; Self v. United States, *supra; cf.* Simpson v. Wainwright, 5 Cir. 1971, 439 F.2d 948.

### Newspaper Publicity

Manning's parents were the last witnesses to testify on the second day of the trial. Immediately following their testimony the trial judge admonished the jury not to read any newspaper accounts of the trial. The following morning a newspaper article stated:

A Starke couple testified in federal court here Thursday that they received in the mail a package of money from their son, who is now on trial on bank robbery.

On the ground that neither of Manning's parents had testified that Manning had mailed the Seagram's carton containing $2851 in cash to them, Manning moved for a mistrial. The motion was ultimately denied and, we think, properly so. A short answer to the alleged misprision of trial testimony which appeared in the press is that the article was factually correct. Manning's father, without objection, unequivocally testified that his wife received the package from their son. Thus there could have been no prejudice to Manning, even assuming that members of the jury read the paper. But there is, of course, no suggestion, much less proof, that any juror read the article.

3. This article was not offered or marked as an exhibit.

4. The court commented: "I have admonished them in the beginning not to base their verdict on anything except the evidence; I told them not to read the

Manning's counsel candidly conceded that he was "aware of the fact that the Court admonished the jury specifically not to read any newspaper articles" and that he did "not know if the jury had seen it, or read it." He did not request that the court poll the jury. At the close of the Government's case, Manning's counsel alluded to another article which apparently appeared after the one in question but about which he made no complaint.[3] This article, however, prompted counsel for the first time to request that the court interrogate the jurors. The court denied this request and a motion for a mistrial.[4]

 It is within the discretion of the trial court to interrogate or poll the jury to ascertain whether they have read newspaper articles pertaining to the trial. Ford v. United States, 5 Cir. 1956, 233 F.2d 56, 62, cert. denied, 352 U.S. 833, 77 S.Ct. 49, 1 L.Ed.2d 53. No abuse of discretion has been shown here.

Assuming that the jurors read the article, and given an interpretation of the record as Manning would like to read it, we could not disturb the exercise of the large discretion that the trial judge has in ruling on the issue of prejudice resulting from jurors' reading of news articles concerning the trial. Holt v. United States, 1910, 218 U.S. 245, 251, 31 S. Ct. 2, 54 L.Ed. 1021; Gordon v. United States, 5 Cir. 1971, 438 F.2d 858; Marshall v. United States, 1956, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250, and Mares v. United States, 10 Cir. 1967, 383 F.2d 805, relied upon by Manning, are factually inapposite. In contrast to *Marshall* and *Mares*, no evidence here was excluded from the jury's consideration because of its inherently prejudicial character and then vividly reported in the newspaper the following day.

newspapers; and at one point—in light sort of fashion, without putting the spotlight on it—I asked them if they were carrying out my instructions and they all indicated they were—I watched them right down the line."

We have carefully considered Manning's other specifications of error and find them to be without merit.

Affirmed.