**UNITED STATES of America**

v.

**Robert WYLER and Dianne Becker, Defendants.**

**No. 79 Cr. 779.**

United States District Court, S. D. New York.

Oct. 22, 1980.

See also, D.C., 502 F.Supp. 969.

John S. Martin, U. S. Atty., S. D. New York by Minna Schrag, Asst. U. S. Atty., New York City, for United States of America.

Paul Goldberger, Goldberger, Feldman, Dubin & Young, New York City, for defendant, Robert Wyler.

Jerry Feldman, Goldberger, Feldman, Dubin & Young, New York City, for defendant Dianne Becker.

PIERCE, District Judge.

## OPINION AND ORDER

In July 1980, Shawn Dianne Becker and Robert Wyler were arrested on charges stemming from a November 1979 indictment for conspiracy to extort and extortion in violation of 18 U.S.C. § 894.

On September 9, 1980, approximately one month before the scheduled commencement of their trial, the defendants moved to suppress "all materials, records, documents and the fruits thereof" seized during the May 29 and May 31, 1978 searches of a house they were renting at 3800 N.W. 89th Avenue

Hollywood, Florida (hereinafter alternative-ly "3800" or "the Florida house"). The circumstances surrounding the search of 3800 were elicited at a two day suppression hearing held on September 17 and September 22, 1980.

Since the government agents did not obtain a search warrant and neither of the defendants authorized or consented to the entry, they contend that the search infringed upon their reasonable expectations of privacy in violation of the Fourth Amendment.

The government admits that there was no search warrant but contends that its agents entered 3800 at the invitation of the mortgage holder of the property after the premises had been abandoned.

For the reasons detailed below, the motion to suppress the physical evidence is granted.[1]

*FACTS*

The following constitutes the Court's findings of fact in this case. These findings are made after observing the demeanor and assessing the credibility of the witnesses who testified and examining the various documents submitted by the parties.

In early 1977 defendants Shawn Dianne Becker and Robert Wyler moved their furniture and other possessions from their residence in Port Washington, New York, to the Florida house. Joe LaLota, a Nassau County police officer and operator of a small moving company, handled the move. Wyler and Becker arranged to rent the premises at 3800 through one Robert Codling, a real estate agent at the Alamo Realty Company in Florida. The monthly rental was $1,100 and included an option to buy by assuming a $40,000 balloon mortgage. The house was rented in Becker's name but she testified that she could not recall whether she had signed a written rental agreement. Internal Revenue Service Agent Kevin Craddock, a government witness who conducted a tax investigation of Shawn Becker and her business interests, testified that he had seen a lease on the subject premises and had a copy of the document in his files. Neither side introduced the lease into evidence.

■ Although Becker actually rented the house, the undisputed testimony of both Wyler and Becker establishes that they resided in it together and appear to have shared expenses, including rent paid for the premises.[2] For the most part the defendants claim the rent was paid in cash although Becker occasionally paid the rental of $1,100 by check. (A Dania Bank checking account statement for Shawn's Camelot, a nightclub owned by Becker, reflects an $1,100 debit on April 25, 1978 (Govt. Exh. 2). This the Court infers was a rental payment.) They also moved their furniture from Long Island to the Florida house (corroborated by LaLota); they arranged for maintenance, and obtained telephone and electric service (Govt. Exhs. 15 & 16); Becker maintained a checking account (Govt. Exh. 3) and a safe deposit box (Govt. Exh. 1) at local banks. These activities support the defendants' position that they were residents of the Florida house. However, during this time Wyler and Becker also continued to receive mail at a variety of post office boxes and addresses.

In or about early April of 1978 Wyler was arrested and on April 11, 1978 he appeared in New York before Judge Carter of this Court for a criminal pre–trial conference on Indictment 78 Cr. 150. Wyler did not appear on April 24, 1978 when the trial of the matter before Judge Carter was scheduled to commence. He was thereafter considered a fugitive and a warrant was issued for his arrest. Although it is impossible to determine the precise date in April when

---

1. The materials, records and documents seized from the Florida house will be suppressed by virtue of this order. The Court withholds decision on the "fruits" of the search pending a further hearing on the issue of attenuation. See, *United States v. Cecollini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978).

2. As joint tenants *both* Wyler and Becker had a reasonable expectation of privacy in the premises. *United States v. Cataldo*, 433 F.2d 38 (2d Cir.), *cert. denied*, 401 U.S. 977, 91 S.Ct. 1200, 28 L.Ed.2d 326 (1970).

Wyler left the Florida house, it is clear that he was a fugitive during the critical period from mid–April until early June. He returned to the Florida house in June, after the search in issue, peered through the windows, saw the house in disarray and did not re–enter.

Becker testified that she continued to reside in the house during April and May 1978, and that she communicated with Wyler about the house by telephone. At least two hundred long distance calls were made from Becker's telephones during the month of April 1978. (Govt. Exhs. 15 & 16). The majority of these calls were made to Miami, Florida, where Wyler testified he spent time while a fugitive. The Court concludes that Wyler and Becker continued to communicate during this period. Becker also met with Wyler once in New York after his arrest. In the Court's view, Wyler intended to continue to maintain his expectation of privacy in the Florida house even while he was away.

Becker testified that in April 1978 she decided to leave Florida temporarily to go to Fort Wayne, Indiana, for an operation on her foot. During this period she resolved to ship certain of the furniture from the Florida house to her mother in California and, pursuant to Wyler's request, to ship his business and legal papers to him in New York. However, both defendants planned to leave some of their possessions in the Florida house because they intended, however tentatively, to continue their residence there.

Becker made shipping arrangements by contacting Joe LaLota who had initially packed and moved their property from Port Washington, New York. LaLota, a government witness, received a telephone call in late April 1978 in which Becker told him that she wanted "to move her belongings from Hollywood, Florida to Hollywood, California." On May 4, 1978 they met at a Bagel Nosh restaurant in New York City to discuss the arrangements. At that meeting, Becker told LaLota that she wanted the furniture and other household items moved from the Florida house to California

where the goods would be "consigned to storage because she was going to travel with her boyfriend and see the country." LaLota gave Becker an estimate of $1,500 for moving based upon the items she identified were to be moved. There was no testimony as to any discussion between Becker and LaLota regarding which items, if any, were to remain.

Although Becker indicated that she wanted, LaLota to personally handle the packing, there was no mention of any deadline and no specific date for the packing and shipment was set. Becker signed the shipping order (Govt. Exhs. 9 & 9(A)) authorizing the shipment. Becker also asked LaLota to arrange to transport a Cadillac, one of the two cars Wyler and Becker owned, to her parents in California for the purpose of selling it. She left the Cadillac with LaLota when they met in New York; LaLota testified that he parked the car which had "a red velvet interior full of dog hair" in a New York garage and eventually had the car driven to California. The defendants also owned a B.M.W. which Becker testified she gave to her father in California when she left Florida. However, the record is silent regarding how or when that vehicle was transported.

LaLota testified that on or about May 22, 1978 he received another phone call from Shawn Becker. She told him that the packing had to take place on May 24th, a date which she insisted upon despite LaLota's protests that it conflicted with his police work schedule. According to Becker, she had insisted on the May 24th packing date because that was the only day her mother could be in Florida to supervise the packing. LaLota and Becker agreed upon this date and, on May 24th when LaLota arrived at the house, he was greeted by a woman who introduced herself as Shawn Becker's mother, Sylvia Becker. He had not previously been told that Becker would not be there herself. Becker testified that by this date she had already left Florida for Fort Wayne, Indiana. After leaving Florida she testified that she went first to New York and later left for Fort Wayne either from New York or Connecticut.

LaLota testified that, at the Florida house, he and Sylvia Becker went from room to room to determine "what was to be packed and not packed." During this tour they came upon a closet full of neatly stacked business papers which Mrs. Becker told him to pack but keep separate because these items were not to be shipped to California. LaLota recalled seeing the name "Shawn's Camelot" on some of these papers although he only glanced at them briefly. Since he had to return to New York that night, LaLota did not have time to pack those papers.

During his packing of Shawn Becker's household goods, LaLota saw Mrs. Becker sell several items, including liquor, hand guns and lawn furniture; he recalls that she gave him a bowie knife which he had expressed interest in purchasing and she offered to sell some other items to him. LaLota recalled packing "dishes but not clothing" and "bric–a–brac, paintings, pictures, figurines, and record albums." He observed Mrs. Becker also packing boxes although he did not know what items she packed. LaLota testified that he saw furniture in the house and that he "believed a living room set was still in the house" when he left for New York.

Important and credible details involving the shipment to California were provided by a witness named Charles Booher. Booher was the driver of the moving van destined for California. He supervised removal of certain items from the Florida house. (Govt. Exh. 10, the bill of lading, lists 60 items moved from the premises; 34 of these were cartons). On May 26, 1978 Booher arrived at the house with two helpers after having a conversation with the "lady who owned the house." This woman was no doubt Sylvia Becker. He found the key in a mutually agreed upon place and entered the house. Booher revealed that, when he entered, he "found the house orderly", that it looked lived in and was not "in shambles." In fact the movers used glasses and ice they found in the kitchen which demonstrates that the electricity and appliances were still operating. He had been told by Mrs. Becker that certain of the cartons were to be moved, and, more importantly, that *other cartons and furniture were to remain.* Booher was told by Mrs. Becker to take only the furniture and cartons marked "take".

According to Booher, approximately six hours after they began loading the truck, when the job was three–quarters complete, he and his helpers were interrupted by "three men who came to the house with guns and a badge" and told him "not to take anything out and to leave." One of these men identified himself as being from the Sheriff's office. Although these men showed no search warrant or other authorization, they sought to search Booher's truck but he refused to permit it. Booher was *unable to complete loading all of the items which were to be shipped to California. Thus, when Booher left, there were cartons remaining which he understood were to have been shipped plus other cartons and furniture (including a buffet, two or three overstuffed chairs, a couch and end tables) which he credibly testified he was directed by Mrs. Sylvia Becker to leave in the house.* The three men who interrupted Booher's loading were still in the house when he and his helpers left. The government represents that these three men were not federal agents. There is no evidence in the record to assist the Court in determining what transpired from the time Booher left on May 26, 1978 and May 29, 1978 when one Schukter, and federal agents Schuler and Harris entered the Florida house.

Further information about the Florida house was provided by one Kevin Craddock, an Internal Revenue Service Agent who was conducting a tax investigation of Shawn Becker and Shawn's Camelot. On May 16, 1978 Craddock went to 3800 to interview Becker. While there, he met one Bucky Glaze cutting grass around the premises. Glaze told him that he was cutting grass for William Schukter who owned 3800. Glaze told Craddock that he knew Shawn Becker and that she had asked him to watch the house because she was going to New York for a few days "to visit Bobby who was ill." Craddock testified that on

May 16, 17 and 18 he checked the Becker house. He looked in the windows, and saw furniture, drapes, a table and chairs in the kitchen. From the appearance of the property Craddock "thought the house was furnished and somebody lived there." Craddock left his business card in the door with a telephone number where he could be reached. Becker never contacted him.

In the course of his investigation, Craddock learned that the electric bills for 3800 were sent to Shawn Becker at a Pembroke Pines, Florida, address and that they had not been paid since March 1978, although the electric service was still operating. Craddock's investigation revealed that two of the telephones in the house had been removed in April 1978 and on May 26, 1978 service on the last phone was terminated at the customer's request. Moreover, while the telephone records (Govt. Exh. 15) show that the telephone service was terminated on May 26, they do not reflect that the instrument was removed or that bills were owing.

In May and June 1978, during the course of his investigation, Craddock sent three certified letters to Becker (Govt. Exhs. 17, 17A & 17B) which were not claimed at the post office. The earliest of these three was postmarked "May 18, 1978."

Craddock also met with Codling, the real estate agent, during this period. *Codling told Craddock that Becker had rented the house and that no back rent was owed by the defendants.* Later, having asked to be contacted if the realtor heard from Becker, Craddock received a call from Codling on May 30, 1980 who told him that he had received a money order for $1,100 (the rental due for June) drawn on the First Bank and Trust Company of South Bend, Indiana. The money order, payable to "Robert Codling c/o Aalamo [sic] Properties Inc." was dated May 23, 1978 and signed by Shawn Becker. The envelope was postmarked "May 24, 1978, Flushing, New York." (Govt. Exhs. 8 & 8A). *The Court finds that this money order was payment of the rent for the month of June 1978.*

According to the testimony of Special Agent John R. Schuler of the Drug Enforcement Administration (DEA) on May 29, 1978, he received word that one William Schukter had called the DEA in Miami. When Schuler returned the call Schukter told him that he held the mortgage on 3800, that neighbors near the house had told him that the tenants had vacated the house, that he went to the house, found it vacant, entered and found what he thought was illegal drug evidence (white powder in three plastic baggies and half a dozen pills). Schukter also told Agent Schuler that he had found some papers belonging to "Bobby Wyler" in which the government might have an interest. After a computer check of DEA records revealed that Wyler was a DEA fugitive, Agent Schuler and Detective Pete Williams of the Oakland Park Police Department met Schukter who showed them what he had found and agreed to take them to the house. Agent Schuler's field tests of the white powder were negative indicating that the substance was not cocaine or heroin.

Schuler and Williams, joined at the house by DEA Agent Jim Harris, surveyed the area around 3800, looked through the windows, and determined that the premises appeared to be vacant. Schukter let them inside; thus, the Court concludes that the doors to the house were locked. Once inside, Schuler testified, they found papers strewn about, very little furniture (Schuler recalled seeing only a couch and a bed), some clothing in the closets and none of the usual kitchen accouterments (dishes, toaster, etc.) Schuler and Harris gathered up some of the papers, took possession of a shotgun they found, and left. Schukter remained with them during the search.

Two days later on May 31, 1978, Agent Schuler, accompanied by Special Agent William Oakes of the New York DEA office, returned to the premises and took possession of additional papers. Oakes testified that when he arrived at 3800 on May 31st the house "looked deserted and ill-kept; the grass was high (about 3 inches), and the house didn't look like it had been taken care of." There appeared to be very little furni-

ture. He testified that he entered with Schuler through a side door which they had to "jiggle" open because it was locked. Oakes recalls seeing a metal bed stand, a mattress and some bar stools. He does not recall seeing either a couch or clothing. He testified that the agents found business records of Shawn's Camelot and records pertaining to Gulfport Seafoods. He took possession of the papers but did not inventory them. Neither agent inventoried any of the papers taken on either occasion. When questioned as to why he had not obtained a search warrant, Oakes responded that he had understood that William Schukter, the mortgage holder, had consented to the entry.

## THE GOVERNMENT'S BURDEN

The parties do not dispute that the federal agents who searched the premises at 3800 did not have a search warrant when they entered on May 29, 1978 or when they re-entered on May 31, 1978. In fact, the testimony of both DEA Agents John Schuler and William Oakes indicated that they neither discussed the need for a warrant nor sought to obtain one.

It is well settled that evidence seized as a result of a warrantless search is inadmissible at trial unless the search can be justified as one of the "specifically established and well-delineated exceptions" to the Fourth Amendment's warrant requirement. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967). During the suppression hearing and in its memorandum of law the government relied upon the warrant exception theories of consent, *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) and abandonment, *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960).

■ In seeking to justify a warrantless entry and search of a person's home the government bears an onerous burden for "the physical entry of *the home* is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752, 764 (1971) (Emphasis added.) During

the suppression hearing, the Court held that the defendants, as the moving parties, bore the initial burden of demonstrating a proprietary interest and expectation of privacy in the property searched. *United States v. Arboleda*, 633 F.2d 985, slip op. 79–1278 (2d Cir. June 9, 1980); *United States v. Mangan*, 575 F.2d 32 (2d Cir.), *cert. denied*, 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324–25 (1978). Once this was shown, the Court held, it was the government's burden to establish that one of the "jealously guarded and carefully drawn" Fourth Amendment exceptions existed, *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1970), thereby obviating the need for a warrant.

The parties are in agreement that the applicable standard of proof imposed upon the government is a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177–78 n.14, 94 S.Ct. 988, 996, 39 L.Ed.2d 242, 253 (1977).

Therefore, the Court holds that in order to defeat the defendants' motion to suppress once the defendants have shown a proprietary interest and an expectation of privacy, the government must demonstrate by a preponderance of the evidence that there was valid consent for the agents to enter or that the defendants abandoned their reasonable expectation of privacy in the premises.

## CONSENT

■ The government's initial justification for the warrantless search was that the agents entered with the consent of William Schukter who held the mortgage. One of the established exceptions to the warrant requirement is that of a search conducted with consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Permission to search need not come only from the target; it may also be obtained from a proper third party. *United States v. Matlock, supra* 415 U.S. at 171, 94 S.Ct. at 993.

However, the limits of third party consent are not boundless. It is established that:

"Consent to a search by one with access to the area searched, and either common authority over it, a substantial interest in it or permission to exercise that access, express or implied, alone validates the search." *United States v. Gradowski*, 502 F.2d 563, 564 (2d Cir. 1974) (per curiam). Thus, a landlord without more, cannot validly consent to the search of his tenant's apartment, *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), nor can a night clerk's consent validate a warrantless search of a hotel guest's room. *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964).

The government contends that if the premises were vacated or abandoned by Wyler and Becker, Schukter, the mortgage holder, had the right to re-enter, and, consequently, he could validly authorize the agents to enter. *United States v. Parizo*, 514 F.2d 52 (2d Cir. 1975).

■ Assuming, *arguendo* that the premises were abandoned, the government has failed to establish that Schukter, as the mortgage holder, regained any access to, or control over, the property. The property was rented to Wyler and Becker through Alamo Realty; they paid rent to Alamo directly; and, they had paid the June rent when Schukter authorized the agents' entry. Both defendants testified that they had had no dealings with Schukter and there is no evidence in the record to support the government's contention that Wyler is the same John Wheeler to whom Schukter allegedly sold the house. If mortgage payments were not made promptly, Schukter's authority under the mortgage was foreclosure and a receivership (Def. Exh. A, ¶ 13). The deed does not expressly provide for an automatic right to re-enter.

Therefore, the Court concludes that William Schukter did not have a right to re-enter the premises and, consequently, he had no right to authorize others to do so. His consent was therefore invalid and did not obviate the need for a warrant.

### ABANDONMENT

■ In order to find an abandonment, there is no requirement that the defendants performed "a ritual; rather it is a question of intent." *United States v. Cowan*, 396 F.2d 83, 87 (2d Cir. 1968). It is not a conclusion premised upon traditional theories of property right. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Yet, "[p]reliminary to the inquiry into intentional abandonment by the defendant, it must be shown that the defendant had sufficient control over the premises to establish a right therein." *United States v. Parizo*, 514 F.2d 52, 55 (2d Cir. 1975). Once the initial proprietary interest is established the core question becomes whether the complainants have abandoned their reasonable expectations of privacy in the property searched or the goods seized. *United States v. Wilson*, 472 F.2d 901 (9th Cir. 1972), *cert. denied*, 414 U.S. 368, 94 S.Ct. 176, 38 L.Ed.2d 116 (1973). If the reasonable expectation of privacy has been abandoned, the defendants suffer no infringement of Fourth Amendment rights when the property is searched or goods are seized. *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); *United States v. DeLarosa*, 450 F.2d 1057 (3d Cir. 1971), *cert. denied*, 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972).

It is clear that Wyler and Becker had a proprietary interest in the property for more than a year. Becker appears to have signed a lease; both Becker and Wyler paid the rent; and they had telephone and electric service in the house. Thus, the critical question is whether the totality of the evidence indicates that the defendants abandoned the premises in April–May 1978 and thereby retained no reasonable expectation of privacy therein.

Given the traditional view that "a man's [or woman's] home is his [or her] castle" recently enunciated by the Supreme Court in *Payton v. New York*, 445 U.S. ——, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the presumption must run against abandonment. Unlike the abandoned trash in the hotel room in *Abel v. United States, supra*, or the

hotel room itself in *United States v. Haddad*, 558 F.2d 968 (9th Cir. 1977), or the luggage in *United States v. Cowan, supra,* or the car in *United States v. Manning*, 440 F.2d 1105 (5th Cir.), *cert. denied*, 404 U.S. 837, 92 S.Ct. 125, 30 L.Ed.2d 69 (1971), the premises involved in this case were the defendants' home where it is reasonable for one to expect the maximum degree of privacy. Accordingly, a very heavy burden of justification must be placed upon officials who enter a house or dwelling without authorization for "[f]reedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." *Payton v. New York, supra*, 445 U.S. at 587, 100 S.Ct. at 1381 quoting the late Judge Harold Leventhal in *Dorman v. United States*, 435 F.2d 385, 389 (D.C.Cir.1969) (en banc).

The majority of the precedents in the area of abandonment have arisen in the context of a search of a hotel room, *United States v. Cowan, supra; United States v. Parizo, supra; United States v. Haddad, supra; United States v. Akin*, 562 F.2d 459 (7th Cir. 1977), *cert. denied*, 435 U.S. 933, 98 S.Ct. 1509, 55 L.Ed.2d 531 (1978).

While these cases provide some guidance as to the factual circumstances which may constitute abandonment, they are not particularly helpful in this case. The nature of hotel occupancy is generally transient; the expectation of privacy is diminished by the numbers of hotel chambermaids, who have daily access, and room clerks and former guests who have room keys. The hotel guest who demands maximum privacy uses a "Do Not Disturb" sign usually provided by the management. Rarely, does a homeowner post such notice on his lawn nor does an apartment dweller affix such a sign to his door. Thus, while transiently occupied hotel room cases may provide guidance by analogy, stricter scrutiny must be applied when the government seeks to demonstrate that a defendant has abandoned his home. In this Court's view, the government has not met its burden here.

In weighing the government's evidence the Court has considered the totality of the relevant circumstances existing at the time of the alleged abandonment. *United States v. Manning, supra,* at 1111. Subsequent behavior and events which bear on the issue of intent to abandon were also considered. *United States v. Callabrass*, 607 F.2d 559, 565 (2d Cir. 1979) (Oakes, J. dissenting on other grounds), *United States v. Akin, supra.* On the day when the agents entered 3800 Wyler was a fugitive, and Becker admittedly was not present in the house. At the hearing, Becker's testimony regarding her activities and whereabouts during the period in question were largely incredible. That she offered one explanation of her departure from Florida to LaLota (touring the country with her boyfriend) another to Bucky Glaze (going to see Bobby who is ill) and still another to the Court (having her foot treated in Indiana) suggests that she, like Wyler, may have been evading law enforcement agents during the period. The government's position is also buttressed by the fact that arrangements had been made to ship much of the defendants' furniture and household goods; most of these goods had been removed by May 29 when the first search occurred. Mail had not been picked up; electric bills appear to have been past due; telephones had been turned off or removed; and, the house is said to have been in disarray when the agents entered. After the search Wyler and Becker both created false identities, and neither of them ever re-entered the house. Indeed, Becker appears to have never returned to the premises.

Yet, while the government is not wholly devoid of evidence to support its claim that the premises had been abandoned on May 29, 1978 when the agents first entered, the weight of the evidence does not tip in this direction. Rather, the Court finds from the totality of all of the evidence that the defendants manifested an intent to maintain their privacy interests in the premises, and in their property therein, even though they were not physically present on the dates of the searches and seizures.

It is undisputed by the government that on May 23, 1978 Shawn Becker paid the rent for the Florida house for the month of June. She made this payment despite the fact that she was away from the house and had made arrangements to ship many of her possessions from the house to California, and notwithstanding the fact that she had terminated telephone service and electric bills had not been paid. While it is quite possible to have a proprietary interest and yet abandon property, the payment of rent *prior* to the search coupled with the additional credible evidence discussed below leads to the conclusion that continued occupancy was intended.

The evidence is clear that Shawn Becker intended to ship certain possessions to California. As discussed above, the arrangements were made well in advance of the scheduled shipment, thus reflecting careful planning rather than a hasty departure. The Court finds LaLota's testimony on this point wholly credible. In addition, the evidence demonstrates a clear intention to leave certain possessions in the house after the shipment to California. The highly credible testimony of both LaLota and Booher warrants a finding that some of the possessions were intended to be shipped to California while others, although packed, were to be left in the house. Moreover, certain of the goods which were destined for California were never loaded on Booher's truck because he was interrupted by three unknown men during the loading and thus, these goods were also still left in the house as of May 26th. The Court notes further that Booher testified that the Florida house was orderly when he arrived and also when he left.

It weighs in Becker's favor that according to the testimony of IRS Agent Craddock, Bucky Glaze was asked by Shawn Becker to watch the house while she was away in New York. It is noted also that each time the agents entered the house, the doors were closed and locked. Of still fur-

ther interest is evidence that advance notice was given to the telephone company to terminate service on two of the phones. Finally, at least one of the parties (Wyler) returned to the house after the searches had occurred, but, after looking in the window, did not enter. While his failure to enter does not suggest intent to occupy, the return to the house runs counter to a claim of abandonment.

These assorted shreds of evidence do not suggest a hasty departure or abandonment of one's home. Rather, altogether they support a finding that the defendants did not abandon the Florida house as of May 29, 1978, and, therefore, the government has failed to establish by a preponderance of the evidence that the defendants Wyler and Becker had abandoned their reasonable expectations of privacy in the Florida house or the contents therein at the time of the searches.

## CONCLUSION

Since the government has failed to establish by a preponderance of the evidence either that valid consent was given for the agents to enter the defendants' Florida house, or that the defendants had abandoned their reasonable expectations of privacy in the house, the Court finds that the search and subsequent seizure violated the defendants' Fourth Amendment rights.[3] Accordingly, the motion to suppress the physical evidence seized in the search is granted.

So ordered.

---

**3.** The Court also finds that the search, although unlawful, was undertaken in good faith. The agents entered with the good faith belief, albeit mistaken, that the premises had been abandoned and that the entry was properly authorized by Schukter.