# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs May 20, 2014

## STATE OF TENNESSEE v. CHRISTINA LEE JONES THOMAS

**Appeal from the Criminal Court for Washington County**
**No. 31286B     Robert E. Cupp, Judge**

---

**No. E2013-01531-CCA-R3-CD - Filed July 14, 2014**

---

The Defendant, Christina Lee Jones Thomas, was convicted by a Washington County jury of especially aggravated robbery and especially aggravated kidnapping.  Following a sentencing hearing, the trial court imposed concurrent terms of eighteen years at 100% for these convictions.  On appeal, the Defendant claims that she had not abandoned her residence as the trial court determined and that, therefore, it was error to deny her motion to suppress the evidence found inside her home obtained without a search warrant.  The Defendant also contends that the evidence adduced at trial is insufficient to support her convictions and that the trial court abused its discretion in enhancing the length of her sentences.  After reviewing the record, we conclude that trial court did not err in denying the Defendant's motion to suppress because the Defendant had abandoned the property, that the evidence produced at trial was sufficient to support the Defendant's convictions, and that the trial court did not abuse its discretion in setting the length of the Defendant's sentences.  Accordingly, the judgments of the trial court are affirmed.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and JEFFREY S. BIVINS, JJ., joined.

J. Matthew Bolton (at trial and on appeal), Johnson City, Tennessee; and James Beeler and Todd Ross (at suppression hearing), Kingsport, Tennessee, for the appellant, Christina Lee Jones Thomas.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Tony Clark, District Attorney General; and Janet Hardin and Erin McArdle, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION
## FACTUAL BACKGROUND

This case concerns the April 9, 2005 beating and robbery of Donald Teague ("the victim") by his tenants ("the defendants") at the rented residence. Thereafter, a Washington County grand jury indicted the defendants for especially aggravated robbery and especially aggravated kidnapping. Prior to trial, the Defendant filed a motion to suppress the evidence found inside the home without a warrant, and that motion was denied. The Defendant proceeded to trial in July 2012.

The evidence presented at trial revealed the following facts. The Defendant and James Steven Thomas ("the co-defendant"),[1] along with their three children, rented a mobile home from the elderly victim, who was eighty-three years old at the time of trial. In April 2005, the couple was three or four months behind on their rent according to the victim. In addition to various rental properties, the victim also owned and operated a local grocery store. The victim stated that he had cashed checks for the defendants in the past and that they knew he often carried large sums of cash on his person.

On April 8, 2005, the defendants, who had just received their income tax return, visited the victim's grocery store. When the victim emerged from his office, he asked the Defendant if she had come to pay rent. At that time, the co-defendant walked back outside. The Defendant replied that they had not cashed the income tax check yet because the children were sick and asked the victim if he could come to the mobile home the following day to pick up the rent money. The victim agreed.

The following morning, the Defendant called the store and asked if the victim would cash the income check for them and if the victim "could come out [to the trailer] right then[.]" The victim said that he would. After he hung up the phone, it rang again almost immediately, and the Defendant inquired if the victim had left the store yet. The victim talked with the Defendant a second time and then left the store to go to the trailer park.

Upon the victim's arrival at the residence, he saw the couple's car parked out front, and as he walked by, he saw the Defendant's oldest daughter, M.J., sitting inside, whom he patted on the head. M.J.,[2] who was fifteen years old at the time of trial, said that she and her siblings were in the car that morning because she had been told they were moving to

---

[1] The co-defendant pled guilty to reduced charges prior to the Defendant's trial.

[2] It is the policy of this court to protect the identities of minor witnesses, so we will refer to this witness by her initials.

Arkansas. The car was packed with clothes and toys prior the victim's arrival. According to M.J., the defendants put her and her sisters in the car and told them to stay there "no matter what."

The victim went to the door of the trailer, and the co-defendant invited him inside. The victim went inside, saw the Defendant standing to his left, and sat down on the couch. The victim then asked the amount of the income tax return, and the Defendant told him the check was for $439.32. As the Defendant went to get the check, the victim counted out the money and returned his wallet to his pants. Then, the co-defendant started hitting the victim in the head, and the victim fell forward. The co-defendant continued to hit him multiple times. During the beating, the co-defendant placed his knee in the victim's back and asked the Defendant to "come here and help [him] hold" the victim. The Defendant came to assist. She also removed the victim's wallet from his pants at the urging of the co-defendant. According to the victim, the co-defendant continued to hold him down and beat him with "a club of some kind[,]" and while this occurred, the Defendant hit him twice in the head with a hard object, leaving two puncture wounds. He was not sure of the object the Defendant used to inflict these blows, but he was sure it was not a fist. The victim testified that he had between $4,200 and $4,500 in cash and $900 in checks inside his wallet when it was taken from him. The victim stated that he was not armed during the incident, although he often carried a weapon.

The victim stated that he was "groggy" from the beating but did not lose consciousness during the ordeal. He was lying on the floor, and the Defendant tied his hands behind his back, tied his feet together, stuffed a dirty sock in his mouth, and tied something around his head. The defendants then left the trailer.

According to M.J., the defendants ran out of the trailer and got into the car, wiping blood off their hands. Once inside the car, the defendants picked up a needle and used it to shoot drugs. M.J. stated that they then drove around to the back of the trailer and threw the victim's car keys away. She also saw the Defendant remove money from the victim's wallet and throw the wallet out the window.

The victim was able to free himself and proceeded to a nearby neighbor's residence where the police were called. According to the victim, he was "bleeding real bad." While the victim was waiting on the police to arrive, he saw the defendants drive by very slowly and told the neighbor, Cheryl Hutchins, to be careful because the defendants were armed and might shoot. According to Ms. Hutchins, the victim informed her that the defendants had beaten and robbed him, that the Defendant had done most of the beating with a bat, and that the Defendant gave orders to her husband, telling him what to do.

Lieutenant Gary Wiseman of the Washington County Sheriff's Department responded to Ms. Hutchins' residence and found the victim sitting on the porch. According to Lt. Wiseman, the victim was "bleeding from the head"; cloth belts were tied around his arm and neck; and blood was on the victim's shirt. When officers searched the defendants' trailer, they found drops of blood on the floor, blood stains on the couch, a hammer, a rope, a belt, and a "child's bat" in the living room and kitchen area.

Following the incident at the mobile home, the defendants arrived at the home of Jennifer Lynn Tate and Richard Hoilman. When they arrived, Tate noticed that the co-defendant was armed with a handgun displayed in the waistband of his pants. The defendants asked if they had a vehicle for sale, and Hoilman offered to sell them a truck for $1,300. The defendants got into the backseat of the truck and counted their money; Tate saw the Defendant count out thirteen one-hundred dollar bills and then count the remaining money to see how much was left. Tate said she saw "like twenty or thirty one hundreds" in the defendants' possession. The defendants left without purchasing the truck, but they soon returned for a test-drive. While the defendants were out test-driving the truck for a lengthy period of time, Tate saw the defendants on the news, then wanted in connection with the victim's beating, and Tate phoned the police. When the defendants returned to Tate's and Hoilman's with the truck, they saw that the police had gathered there and fled in the truck. The defendants later abandoned the truck at a local bar and left their children with a woman who worked there. When the truck was found, the "plug wires had been jerked and the car keys were gone and it was full of needles and razor blades and baggies" according to Tate. The car that was abandoned at Tate and Hoilman's house had various items of clothing inside and a "hodgepodge" of other things; it was described as "loaded down[.]"

The victim was taken the VA hospital, where his injuries were treated. According to the victim, a nurse stated that she could "see all the way down in[side his] head." Thereafter, a doctor put seventeen "clamps" in the victim's head to close the hole. The victim testified that his head hurt "a lot" while he was healing from the beating.

The defendants were eventually apprehended in Colorado and returned to Tennessee. Thereafter, the Defendant made statements to Sergeant Sam Phillips, a criminal investigator with the Washington County Sheriff's Office, during an interview. The Defendant told Sgt. Phillips that the victim "grabbed [her] breast, [and] he offered to handle it this way or that way[,]" so she "hit him," but would not "say what with," only that she "hit him [be]cause she wanted him to stop." The Defendant then said that they fled because the victim had placed a "hit" on them, that they had two or three hundred dollars on them when they left the trailer, that the victim had tied himself, and that they went back to check on him "but [were] afraid he'd shoot [them]." The interview ceased when the Defendant asked for a lawyer.

The co-defendant testified and gave a different version of events. He stated that the Defendant informed him that the victim had propositioned her, that he had the Defendant call the victim to come to the residence so that he could confront the victim, that the family had no plan to move to Arkansas that day, and that they intended on paying rent to the victim that day when the victim came to the mobile home. The co-defendant also claimed that they were not behind on their rent. The co-defendant asserted that the victim "got hostile" with him once the victim was inside the trailer and that he became angry and "jumped on" the victim. According to the co-defendant, he only hit the victim three times with his fists; the Defendant was not involved in the assault; he never saw the Defendant take the victim's wallet; she had no money until the co-defendant gave her some once they were driving away in the car; and he, not the Defendant, was the one who tied the victim up before they left. The co-defendant asserted that they returned to the mobile home after the altercation "to make sure [the victim] was out of the house and [that] he was [alright]." He acquired a weapon later that evening because he believed "somebody was coming after [him.]"

The co-defendant admitted that he had been involved in some instances of violence with the victim in the past. The co-defendant could not recall his prior statements at his plea submission hearing that the Defendant wanted him to do the things he did to the victim and that they planned it together. He did remember stating at the hearing that they obtained $3,000 from the victim that day.

In January 2007, the victim presented at Holston Valley hospital. He was sick to his stomach with severe headaches and had "blacked out." According to his doctor, at that time, the victim's gait was unsteady; he had difficult understanding and responding to words; his registration and response time was slow; and he had a slight decrease in the ability to use his right upper extremity. His doctor, Ken Smith, classified as an expert in the field of neurology at trial, testified that the victim required brain surgery due to a "sub-dural hematoma" or bleeding in his brain. The Defendant told Dr. Smith of the beating "twenty-two months[']" earlier at the hands of the defendants, stating to Dr. Smith that "he had been hit with a pistol multiple times in the back of the head." Since the beating was the only known traumatic event the victim suffered sufficient to produce this injury, Dr. Smith opined, to a reasonable degree of medical certainty, that the beating was the cause. Although the victim had been in an intervening car wreck, the wreck was minor and, in Dr. Smith's opinion, did not cause the sub-dural hematoma. Dr. Smith described the victim's condition as "life-threatening"; moreover, the victim's recovery time was lengthy, and he suffered seizures during that time according to Dr. Smith.

Based upon the foregoing, the jury found the Defendant guilty as charged, and the trial court sentenced the Defendant to serve concurrent, eighteen-year sentences. This appeal followed.

ANALYSIS

On appeal, the Defendant challenges (1) the denial of her motion to suppress the evidence found inside the home because she lacked standing; (2) the sufficiency of the evidence supporting her convictions; and (3) the enhancement of her sentencing terms. We will address each in turn.

*I. Motion to Suppress*

The Defendant contends that the trial court erred in denying her motion to suppress the evidence seized inside the mobile home by incorrectly determining that she lacked standing to contest the search. She asserts that she and her co-defendant were leaseholders of the property and that the evidence did not support a conclusion of abandonment. The State argues in its brief that the issue is waived due to the Defendant's failure to include a transcript of the suppression hearing in the appellate record. Subsequently, this court granted, with the State's consent, the Defendant's motion to supplement the record with a copy of the missing transcript; however, the State never provided a response to the Defendant's suppression argument once the supplement was filed.

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). The prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. However, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Meeks, 262 S.W.3d at 722.

Here, the trial court denied the Defendant's motion to suppress the search of her residence, finding that she had abandoned the premises and, thus, had no standing to contest the search. In so concluding, the court reasoned as follows:

So, the issue is whether this property was abandoned. . . . I was into the law of renting and tenancy. Apparently, this was a month tenancy. They had a right to be there until they were given a month's notice to be evicted. The

court finds that they were nine days behind in the rent. The court finds that a motive has been proved to commit crimes alleged, two motives. First of all, they were impecunious, had passed bad checks, had no funds. And secondly, that they were addicts because as soon as this happened they were shooting up with -- with some matter of drugs. . . . So, it appears that they lured [the victim] into their residence, already packed, ready to go, that he was beaten viciously with some hard object, that he was tied up . . . . His property was taken, a sizeable amount of money about five thousand dollars; checkbook on a checking account with great amounts of money in that checking account. . . . [T]hey were packed up, children in the car, and according to [M.J.'s] testimony they were ready to go to Arkansas. That they, in fact, did drop the children by a bar that they'd been to before, and abandoned their children. And that -- they weren't even back here for a month apparently, but April 22nd, arrested in Colorado. It wasn't clear when they came back here. They went an extreme . . . distance. So, it appears clearly to the court that the defendants intended to abandon this property; that if you, under the circumstances, lure a landlord in, rob him, beat him, and as he put it, leave him there to die; that's what apparently he thought; packed up, children's clothing, ready to go to Arkansas, they have no expectation of privacy in this piece of property under any scheme that this court could imagine. Therefore, the court finds that the defendants in this case have not proved that they have standing to object to the search that was made. Therefore, we don't need to go on to the other issues of exigent circumstances and other matters.

The general rule is that a tenant, not the landlord, has the expectation of privacy in leased premises, unless the lessor has specifically reserved any rights of possession for himself. State v. Smith, 656 S.W.2d 882, 887 (Tenn. Crim. App. 1983) (citing Chapman v. United States, 365 U.S. 610, 616-17 (1961); W. LaFave, Search & Seizure § 11.3(a) (1978)). Thus, during the rental period the lessee is assumed to have the privacy interests in the premises, unless he abandons the property. Id. (citing People v. Morrison, 583 P.2d 924, 926 (1978); State v. Chiles, 595 P.2d 1130, 1136 (1979)). The test for abandonment is whether the lessee had a reasonable expectation of privacy in the property as of the date of the search. Id. (citing United States v. Wilson, 472 F.2d 901, 902-03 (9th Cir. 1972); Chiles, 595 P.2d at 1136). "Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts." United States v. Colbert, 474 F.2d 174, 176 (5th Cir. 1973). All relevant circumstances existing at the time of the alleged abandonment should be considered. United States v. Manning, 440 F.2d 1105, 1111 (5th Cir. 1971).

The fact that the couple was behind in rent would not automatically preclude a finding that they intended to return to the apartment, given the victim's past flexibility and willingness to work with them. However, additional facts suggest that the couple intended to abandon the premises when they lured their landlord over to the residence to rob him, assaulting him and tying him up prior to their departure. M.J. testified that, on the day in question, prior to the victim's arrival at the residence, she was instructed to get into the car with her two siblings. She had been told that morning that they were leaving for Arkansas, and "the car was packed to leave[.]" When the victim arrived, he stopped by the vehicle and spoke to M.J. before proceeding inside. After some time had passed, the defendants returned to the car. According to M.J., both individuals had blood on their hands when they entered the car. After wiping off the blood, they drove away from the scene. The trial court accredited M.J.'s recount of the events. The trial court's conclusion that the defendants had no intent of returning to the residence was buttressed by the fact that the victim was the defendants' landlord: one would be hard-pressed to believe they could remain a tenant after inflicting such a beating on a landlord and stealing his money. Although they immediately circled back to the residence, their intent in doing so was unclear, and the couple was eventually apprehended hundreds of miles away in Colorado. Taking all of this evidence, we affirm the finding that the couple had abandoned the premises and, thus, had no standing to contest the search. See LaFave § 2.3(a). See, e.g., United States v. Stevenson, 396 F.3d 538, 544-45 (4th Cir. 2005) (where defendant rented his apartment on week-to-week basis and was behind in rent but landlord did not attempt to evict him and indicated he could pay rent later, defendant deemed to have abandoned the apartment after his arrest, as he manifested intention not to return by letter to his girlfriend, giving her ownership of the personal property in his apartment and referring to himself as the "former renter"); United States v. Levasseur, 816 F.2d 37, 44 (2d Cir. 1987) (defendants had abandoned the premises notwithstanding their failure to take their weapons, clothing and personal belongings; "subsequently discovered events may support an inference that appellants had already chosen, and manifested their decision, not to return," and such the case here, as all circumstances indicated that when they learned of arrest of confederates elsewhere they fled to another city to avoid arrest and thus "forfeited their reasonable expectation of privacy"); United States v. De Parias, 805 F.2d 1447, 1458 (11th Cir. 1986) (defendant had abandoned his apartment when he left for another city and told his girlfriend, with whom he shared apartment, that he was not returning; though he "fled Miami to avoid capture, a lawful police investigation does not constitute such coercion that the abandonment should be considered involuntary").

## II. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence supporting her convictions for especially aggravated robbery and especially aggravated kidnapping. She specifically argues that the evidence failed to establish that she was criminally responsible for these

crimes, supporting her involvement only as a facilitator. Additionally, she contends that there was no proof that the victim suffered serious bodily injury or that a deadly weapon was used and that, therefore, she can be guilty of aggravated kidnapping and aggravated robbery at most. The State responds that the evidence is sufficient in these regards.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Especially aggravated robbery is robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a) (emphasis added). As charged in this case, especially aggravated kidnapping is false imprisonment where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-305(a). "False imprisonment" is committed when one "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a).

*A. Criminal Responsibility*

The Defendant submits that she is guilty, at most, of facilitation, not the principal offenses. In support of such argument, she avers that the evidence did not "establish that [she] had any idea that [her] co-defendant was going to hit the victim or take any money from him" but that the evidence instead showed that her "co-defendant made all of the decisions" following the robbery and kidnapping. The State responds that there was "sufficient proof that the [D]efendant aided, planned and assisted in the commission of both offenses and benefitted in the proceeds."

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). As relevant here, a person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2). Criminal responsibility is not a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). To prove guilt through a theory of criminal responsibility the State must establish that the defendant "'knowingly, voluntarily and with common intent unite[d] with the principal offender[] in the commission of the crime.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)).

Facilitation is a lesser-included offense of the crime charged, and the facilitation of the commission of a felony is an offense of the next class below the felony facilitated. Tenn. Code Ann. § 39-11-403(b). Tennessee Code Annotated section 39-11-403(a) provides that "[a] person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony."

The Defendant's sufficiency argument in this regard simply goes to the credibility of the witnesses. The testimony showed that the Defendant placed the phone calls to lure the victim to the residence, aware that the victim carried large sums of cash. The Defendant also helped pack the car before the victim arrived. According to the victim, the Defendant participated in the beating, and the Defendant was the one who inflicted the blows with the hard object that caused the puncture wounds. It was the Defendant who removed the victim's wallet from his pants. It was also the Defendant who put a sock in the victim's mouth and tied him up according to the victim. M.J. testified that, when both individuals got

inside the car, they had blood on their hands, which they wiped off. As they were leaving the residence, the Defendant removed the money form the victim's wallet and threw the wallet out the window. The couple, behind on rent according to the victim, was logically in need of money to support their drug habit at the time they committed these offenses. The Defendant later gave a statement admitting that she hit the victim. The jury, as was its prerogative, chose to accredit this testimony despite the co-defendant's testimony to the contrary. We conclude that there was sufficient evidence for a reasonable juror to find the Defendant guilty either as a principal actor or under a theory of criminal responsibility. The Defendant's argument, that she is guilty only of facilitation, is without merit.

### B. Serious Bodily Injury and Use of a Deadly Weapon

The Defendant also argues that the evidence was insufficient to establish the elements of "serious bodily injury" and "use of a deadly weapon." Because, according to the Defendant, these elements are absent, she is guilty, at most, of aggravated robbery and aggravated kidnapping. The State counters that the evidence established both.

### 1. Serious Bodily Injury

"'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(2). "'Serious bodily injury' means bodily injury that involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or (F) A broken bone of a child who is eight (8) years of age or less[.]" Tenn. Code Ann. § 39-11-106(a)(34).

The evidence presented at trial established that the Defendant intentionally struck the victim twice in the head with a hard object. The Defendant later admitted to hitting the victim with an object, although she did not state specifically what that object was. The victim described repeated blows to his head at the hands of the defendants, and he explained that he was left with a "hole" in his head following the incident. He stated that, although he never lost consciousness, he was "groggy" from the beating and "bleeding real bad." The victim was taken to the VA hospital for treatment for injuries, where, according to the victim, he received seventeen "clamps" in his head to close the wound. The victim stated that his head hurt a lot while he was healing from the beating. In early 2007, the victim presented at the hospital: his gait was unsteady; his registration and response time was slow; and he had a slight decrease in the ability to use his upper right extremity. After discovering bleeding in the victim's brain, the victim required brain surgery, and the State's expert connected this trauma to the April 9, 2005 beating. The expert described the victim's condition as life-threatening; moreover, the victim's recovery time was lengthy, and he suffered seizures during that time. The Defendant attempts to discredit the expert's opinion in her appellate

brief, noting the length of time that had passed since the beating and the intervening car crash as a possible cause of the victim's sub-dural hematoma. However, the jury chose to accredit the State's expert, and we will not disturb their finding in that regard. The record establishes that the victim suffered serious bodily injury in the following enumerated categories: a substantial risk of death; extreme physical pain; and protracted loss or substantial impairment of a function of a bodily member or organ. See Tenn. Code Ann. § 39-11-106(a)(34)(A), (C), (E).

Viewed in the light most favorable to the State, the evidence was sufficient to support a finding of serious bodily injury beyond a reasonable doubt. We feel constrained to note here that a finding of serious bodily injury was all that was needed to support a conviction for especially aggravated kidnapping, use of a deadly weapon was not required under the statutory definition.

### 2. Use of a Deadly Weapon

The Defendant next argues that the "record is devoid of any definitive proof" that a deadly weapon was used during the commission of these offenses. The State argued that three items were possibly used to hit the victim, either the hammer, the bat, or the co-defendant's pistol. The victim stated that he was hit in the head with a hard object although he was unsure which object was actually used; his medical history was introduced; and the Defendant later stated that she hit the victim with an object, although she would not say what. Despite the fact that use of a deadly weapon was established largely through circumstantial evidence, this type of evidence is just a probative as direct evidence. See Dorantes, 331 S.W.3d at 379-81.

In accordance with the foregoing, we conclude that the evidence was sufficient to establish that the Defendant was principally or criminally responsible for these crimes, that the victim suffered serious bodily injury, and that a deadly weapon was used. The Defendant's convictions for especially aggravated robbery and especially aggravated kidnapping are affirmed.

### III. Sentencing

The Defendant contends that the trial court erred in enhancing her sentences. Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses;

and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b). To facilitate appellate review, "it is critical that trial courts adhere to the statutory requirement set forth in Tennessee Code Annotated section 40-35-210(e)" and articulate in the record its reasons for imposing the specific sentence. See State v. Bise, 380 S.W.3d 682, 705 n.41 (Tenn. 2012).

The 2005 amendments to the Sentencing Act "served to increase the discretionary authority of trial courts in sentencing." Bise, 380 S.W.3d at 708. Currently, upon a challenge to the length of the sentence imposed, it is the duty of this court to analyze the issues under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). State v. Carter, 254 S.W.3d 335, 344 (Tenn. 2007). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

Our amended Sentencing Act no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. Tennessee Code Annotated section 40-35-210 was amended to provide as follows:

> (c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.
> (d) The sentence length within the range should be consistent with the purposes and principles of this chapter.

Tenn. Code Ann. § 40-35-210(c), (d).

"[T]he 2005 amendments rendered advisory the manner in which the trial court selects a sentence within the appropriate range, allowing the trial court to be guided by—but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence." Bise, 380 S.W.3d at 706. In accordance with the broad discretion now afforded a trial court's sentencing decision,

> misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

Id.

The Defendant was a Range I, standard offender[3] who was convicted of two Class A felonies; therefore, she was subject to a sentence between fifteen and twenty-five years on each count. See Tenn. Code Ann. § 40-35-112(a)(1). The trial court found that three enhancement factors applied to both of the Defendant's convictions: (1) the Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (2) the Defendant was a leader in the commission of the offenses; and (9) the Defendant possessed or employed a firearm or other deadly weapon during the commission of the offense. See Tenn. Code Ann. § 40-35-114(1), (2), (9). In assessing weight to each factor, the trial court gave factor (1) "little weight"; factor (2) "great weight"; and factor (9) "some weight." No mitigating factors were found. See Tenn. Code Ann. § 40-35-113.

On appeal, the Defendant argues that trial court erred in applying factors (2) and (9) because the proof indicated that her co-defendant was the leader, that there was no proof she participated in the beating, and that there was no proof a deadly weapon was used "at all, much less any proof that [the D]efendant herself possessed or employed a deadly weapon during the commission of the offense." Regarding her criminal history, the Defendant submits that, rather than applying it as an enhancement factor, the trial court should have considered her "lack of any real criminal history" as a mitigating factor. The Defendant

---

[3] The judgment forms correctly note that the Defendant is required to serve 100% of her sentences for especially aggravated kidnapping and especially aggravated robbery. See Tenn. Code Ann. § 40-35-501(i)(2).

further contends that the trial court erroneously considered her failure to testify at trial and "improperly punished" her for it by enhancing her sentence.

Addressing enhancement factor (1), the Defendant's prior criminal history, the presentence report reflects a misdemeanor conviction for theft for which she received six months' probation and a failure to appear on a speeding ticket. We cannot say that the trial court abused its discretion in applying this factor and reiterate its decision to give it "little weight." We also note the Defendant's illicit drug usage, as testified to by her daughter and the co-defendant, as providing evidence of her previous criminal behavior. Thus, the Defendant's argument that the trial court should have considered her "lack of any real criminal history" in mitigation must likewise fail. Moreover, even if she had no criminal history at all, the trial court was not required to consider that as a mitigating factor.

The Defendant's complaints regarding the trial court's use of enhancement factors (2) and (9) are again just challenges to the sufficiency of the evidence and the credibility of the various witnesses. Despite the Defendant's assertions to the contrary, there was sufficient proof that she was an active participant in this plan to lure the victim to the residence to rob him, that she helped in beating and confining the victim once he was inside, and that a deadly weapon was used in the attack. Thus, the evidence supported application of factors (2) and (9). Nonetheless, although not addressed by the Defendant, use of a deadly weapon is an element of the offense of especially aggravated robbery and, therefore, should not have been applied to that conviction. We note that the trial court only gave factor (9) "some weight" in its sentencing decision.

Additionally, the trial court also enhanced the Defendant's sentences based upon her untruthfulness at the sentencing hearing. The Defendant asserts that the trial court erroneously considered her failure to testify at trial and "improperly punished" her for it by enhancing her sentence; however, this assertion mischaracterizes the trial court's statements. The trial court said specifically that it could not consider the Defendant's failure to testify at trial in imposing her sentence but commented on what it believed to be the Defendant's lack of candor at the sentencing hearing. Enhancement factors were rendered merely advisory by the legislative changes made to the Sentencing Act in 2005. Sentencing purposes and principles include the following: "The potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(5). Accordingly, consideration of the Defendant's lack of candor was an acceptable consideration in determining the length of a term to be imposed, as such is consistent with the purposes and principles of the Sentencing Act. See State v. Denise Diane Brannigan, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *18 (Tenn. Crim. App. June 13, 2012).

Although we conclude that the trial court erroneously applied enhancement factor (9) to the Defendant's conviction for especially aggravated kidnapping, this error does not necessitate a sentence modification. Given the directive of Bise from our supreme court, upon a challenge to the sentence imposed, it is the duty of this court to analyze the issues under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Bise, 380 S.W.3d 707. Because the application of enhancement and mitigating factors to adjust a sentence was rendered advisory by the 2005 amendments, we reiterate that the trial court may set a sentence anywhere within the applicable range so long as the sentence is consistent with the principles and purposes of the Act, regardless of the presence or absence of mitigating and enhancement factors. Based on our review, we conclude that application of enhancement factors (1) and (2) to both of the Defendant's convictions, coupled with the Defendant's untruthfulness with the court, support the trial court's discretionary decision to impose an enhanced sentence of eighteen years. The sentencing decision is affirmed.

## CONCLUSION

In sum, we conclude that the trial court did not err in denying the Defendant's motion to suppress, that the evidence is sufficient to sustain the Defendant's convictions, and that the imposition of an enhanced sentencing term was proper. Accordingly, we affirm the judgments of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE

-16-